STATE

v.

David HIGHAM.

No. 2003–0237–C.A.

Supreme Court of Rhode Island.

Dec. 23, 2004.

Virginia M. McGinn, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

SUTTELL, Justice.

The defendant, David Higham, appeals from a judgment of conviction entered in the Superior Court on January 10, 2003, after guilty verdicts by a jury on two counts of first-degree child molestation sexual assault in violation of G.L.1956 § 11–37–8.1 and § 11–37–8.2. The two charges involved sexual assaults committed by the defendant upon his seven-year-old stepgranddaughter. After denying the defendant's motion for a new trial, the trial justice sentenced the defendant to concurrent terms of forty years on each count, with twenty years to serve at the Adult Correctional Institutions and twenty years suspended, with twenty years of probation.

Higham contends that the Superior Court committed two errors that warrant the entry of a judgment of acquittal on the first count and a new trial on the second count. He asserts that the trial justice erred (1) in refusing to pass the case after a witness testified she had discussed the incidents of sexual assault with the victim "in counseling," and (2) in denying defendant's motion for a judgment of acquittal on count 1, because the evidence was not sufficient to establish an act of cunnilingus. For the reasons stated below, we affirm the judgment of conviction.

### Facts and Procedural History

The incident that gave rise to the indictment for two counts of first-degree child molestation sexual assault occurred during the summer of 2000. We shall identify the victim by the fictitious name of Kelly. Kelly's father is defendant's stepson. A short family history may help to understand the facts underlying defendant's conviction.

From October 1993 to January 1994, Kelly lived with her parents in California, where her father was stationed as a member of the Navy. In or around January or February 1994, Kelly and her mother moved back to Rhode Island. Shortly thereafter, Kelly's mother gave birth to a second daughter. They lived with Kelly's maternal grandparents until June 1994, when they moved in with defendant and his wife in West Warwick, where they continued to live until August 1998. At this point, defendant and Kelly's mother apparently had a falling out, as a result of which Kelly, her mother, and sister moved back to her maternal grandparents' house in Warwick. At the end of September or the beginning of October 1998, the rela-

tionship between defendant and Kelly's mother improved, and the girls again spent time at defendant's house, including overnight visits.

During the summer of 2000, Kelly's mother, a certified nursing assistant, was working at a nursing home from 7 a.m. to 3 p.m. The defendant would care for the children during the week to save their mother the cost of child-care expenses.[1] Kelly's mother and defendant agreed that the children would stay at defendant's house, usually from Monday through Thursday. During that summer, therefore, the two girls spent most of their time with defendant. He was solely responsible for their care during the day because his wife also was working. The defendant is totally disabled and is not employed because of serious back and knee problems that have required extensive surgery in the past.

When school started in the fall of 2000, the girls' schedule returned to its normal routine. They lived primarily at their maternal grandparents' house, and stayed over at defendant's house only on occasion. However, after their maternal great-grandmother passed away at the end of September 2000, defendant offered to take the two girls for the week. They stayed with defendant and his wife until the day of the funeral, on October 2, 2000. On that day, defendant and his wife dropped the children off at school and attended the funeral. Later that day the girls returned to their maternal grandparents' house by school bus.

When Kelly, her mother, and sister lived at defendant's house from 1994 to 1998, the two girls shared one of the three bed-

---

1. From the record it is unclear whether this child-care arrangement already was in place during the summer of 1999. According to Kelly's mother, defendant first watched the children full time during the summer of 2000. According to defendant, however, this arrangement began in the summer of 1999 and was repeated in 2000.

rooms in the house. Their mother had the second bedroom to herself, and defendant and his wife slept in the third bedroom. During the nights, the girls, especially Kelly, frequently came to sleep in their mother's bed.

After the family had moved back in with the maternal grandparents, defendant began sleeping in the bedroom formerly occupied by Kelly's mother. Because of problems with his back, defendant needed a firmer mattress than the one available in the marital bedroom. According to the mother's testimony, when the girls stayed overnight at defendant's house, they would often sleep with defendant in his bed. When they moved back to her parents' house in 1998, the children's beds remained at defendant's house. After he learned that the girls did not have beds there and were sleeping on the floor, he and a friend moved their beds to their maternal grandparents' house. Thus, the girls no longer had beds at defendant's home. The defendant testified that in the summer of 2000 the girls would typically sleep on the floor in the living room, or in his bedroom, either with him in bed or on the floor in their sleeping bags. The defendant and his wife testified that the children would decide themselves where they would sleep on any particular night.

By all accounts, up until the incident in question, the children had an excellent relationship with the Highams and with David Higham, in particular. The defendant considered himself as their step-grandfather, "but also on the same edge as being a father, because I was basically the only male in their life, and I had raised these kids since they was [sic] infants." The girls always referred to defendant as their "papa."

Kelly's mother testified that on the night of her grandmother's funeral, on October 2, 2000, while she was driving with her two daughters, she heard the two girls whispering in the back seat of the car. Kelly had asked her sister to tell her mother something, but the younger girl could not remember what. Kelly then proceeded to tell her mother that "papa had done something wrong to her." That same night, Kelly and her mother went to defendant's house and confronted him and his wife with what Kelly had said. After this conversation, defendant told Kelly's mother that the children would no longer be welcome in his home.

At the trial, Kelly testified about the incident that gave rise to the two counts of the indictment in this case. At the time, she was seven years old and her sister was five years old. She said that on the night in question the two girls had been watching television with defendant. As the girls got ready to go to bed, Kelly put on a pair of pajamas with long sleeves and long pants over her underpants. The defendant put on his pajamas in the bathroom and went to bed. According to Kelly, the two girls then jumped into his bed, slipped under the covers and went to sleep.

Kelly next remembered that she was awakened. At this point she was lying on top of defendant with her pajama bottoms off. The defendant had removed his pajama bottoms as well. Her head was near defendant's "private," which she described as the part he uses "when he goes into the bathroom and he goes pee." She testified that she could see his "private" and that it looked like "a hot dog." Kelly further testified that when defendant told her to suck his "private" she went along with him, saying "when he told me to suck, I sucked." At the same time, defendant's head was near her "private," the part she uses for "going in the bathroom and going to pee," which she also calls her "hoo-hoo." Kelly testified that defendant touched her "private" with his mouth and was "sucking

on my private." She could not remember whether he also used his tongue.[2]

Kelly also said that the entire event stopped when she told defendant that she had to use the bathroom. At this point she got up, picked her pajamas and underwear up from the floor, put on her pajamas and went into the bathroom. She did not have to use the bathroom, but testified that her private part was still irritated from defendant's whiskers. After she came out of the bathroom, Kelly testified that she went back to bed with defendant and her sister, who was sleeping. She felt scared about defendant, but went back into the bed and put covers over herself because she "needed some sleep." Initially, Kelly told only her sister about the event, but finally informed her mother in the car on October 2 because "I had to get it out. I couldn't hold it anymore."

During the trial, when Kelly's mother testified, she was asked whether she had prepared her daughter for coming to court and testifying about the incidents in question. She confirmed that she took Kelly to court to show her what it looked like and that she told her what to do. However, in response to the question whether, since October 2, she had talked to Kelly about the incident, she replied, "in counseling." The defendant's counsel immediately voiced an objection, which was sustained by the trial justice, and the response was stricken. The defendant's counsel then moved for a mistrial, and this motion was denied by the trial justice. However, the trial justice provided the jury with the following curative instruction:

"Ladies and gentlemen of the jury, that last response was stricken from the record and I'm instructing you to disregard that, which means put it out of your mind and not consider it in any way in your deliberations. And also you're not to speculate about the question or the answer or about the witness' response about counseling, or anything to do with counseling. It has nothing to do whatsoever with what is in issue in this case, which is whether or not the state can prove each and every element of each of those charges, which I read to you in the indictment, beyond a reasonable doubt. So any counseling or lack of counseling has nothing to do with that issue."

The defendant now appeals the trial justice's denial of his motion to pass, averring that the reference to counseling constituted impermissible vouching for the complaining witness's credibility and was prejudicial to him.

Furthermore, at the conclusion of the state's case, defendant presented a motion for acquittal on the grounds that the state had not proved the elements required to establish the acts of cunnilingus or fellatio. The defendant argued during the trial that cunnilingus and fellatio require actual penetration and that the state was unable to prove this element for either count of the indictment. The trial justice denied defendant's motion for acquittal on both counts.

On appeal, defendant alleges that the trial justice erred by denying his motion for acquittal with regard to count 1, first-degree child molestation sexual assault by an act of cunnilingus.

### Motion for Mistrial

▮ "A trial justice's decision to deny a motion for a mistrial is accorded great weight and will not be disturbed on appeal unless it is clearly wrong." *State v.*

---

2. The two incidents of sexual molestation, namely cunnilingus and fellatio, took place at the same time. For the purposes of sentencing, the trial justice treated them as separate violations of the statute.

*Lynch,* 854 A.2d 1022, 1033 (R.I.2004) (citing *State v. Werner,* 830 A.2d 1107, 1112–13 (R.I.2003)). "[T]he trial justice enjoys a ringside seat at the trial and therefore is in the best posture to determine whether a witness's inappropriate remark [or action] has so inflamed the jurors that they no longer would be able to decide the case based on a calm and dispassionate evaluation of the evidence." *Id.* (quoting *Werner,* 830 A.2d at 1113).

 The defendant predicates his argument that Kelly's mother's testimony constituted impermissible vouching on the case of *State v. Haslam,* 663 A.2d 902 (R.I.1995). In that case, a sexual-abuse-recovery counselor had been permitted to testify about the nature of her counseling session with Amy, the victim of repeated incidents of sexual molestation by her stepfather. *Id.* at 904–05. During the testimony, the prosecutor "repeatedly elicited from [the counselor] the nature of the counseling she provided and framed his questions in such a manner as to emphasize that the counseling was for sexual-abuse recovery." *Id.* In *Haslam* we found that the counselor's testimony constituted impermissible vouching. *Id.* at 906. First, the counselor had no first-hand knowledge that Amy had been sexually abused. In addition, we said that "[t]he repeated references to 'sexual abuse recovery' counseling could only impress upon the jury that Amy had indeed been sexually abused * * *. * * * Although [the counselor's] testimony that she had been counseling Amy for sexual-abuse recovery was not a literal statement of her belief in Amy's truthfulness, we believe that the testimony had the same substantive import and would be perceived by the jury as a conclusive opinion that Amy had testified truthfully." *Id.* at 906. Just as in *Haslam,* in the present case much hinged on the issue of the complaining witness's

credibility. "The determination of the truthfulness or credibility of a witness lies within the exclusive province of the jury." *Id.* at 905 (citing *State v. James,* 557 A.2d 471, 473 (R.I.1989); *State v. Desmarais,* 479 A.2d 745, 748 (R.I.1984); *State v. Castore,* 435 A.2d 321, 326 (R.I.1981)). "Because credibility determinations are solely a jury function, a witness is not permitted to offer an opinion concerning the truthfulness of the testimony of another witness." *Id.* (citing *James,* 557 A.2d at 473; *State v. Tavares,* 590 A.2d 867, 870–71 (R.I.1991); *State v. Nicoletti,* 471 A.2d 613, 617 (R.I. 1984)). "Even when a witness does not literally state an opinion concerning the credibility of another witness but his or her testimony would have the same 'substantive import,' such testimony is inadmissible." *Id.* (citing *Tavares,* 590 A.2d at 870–71; *Commonwealth v. Montanino,* 409 Mass. 500, 567 N.E.2d 1212 (1991)). Consequently, in *Haslam,* the trial justice committed reversible error when he permitted the counselor's testimony with repeated references to sexual abuse counseling. *Id.* at 906.

 It is true that, like the counselor in *Haslam,* Kelly's mother had no direct knowledge of the alleged incidents of abuse that her daughter suffered. However, the present case differs from *Haslam* in significant respects. Instead of repeated references to sexual abuse counseling by a counseling professional, there was only one reference to "counseling" during Kelly's mother's testimony. The record does not mention the particular nature of this counseling. It does not say whether the counseling sessions were conducted by a professional in any particular specialty, how many counseling sessions took place, or whether the counseling was continuing at the time of trial. Furthermore, the line of questioning was ended after this one reference to counseling. Finally, after de-

nying the motion for mistrial, the trial justice immediately proceeded to give the above-quoted curative instruction to the jury.

The facts of this case also fall short of the circumstances in *Lynch,* a recent case, in which we held that no vouching had occurred. *See Lynch,* 854 A.2d at 1033. In *Lynch,* a certified school psychologist had been allowed to testify before a jury what Mary, a victim of sexual molestation at the hands of her father, had told her during a counseling session about the abuse she suffered. *Id.* at 1030. We said that the testimony in *Lynch* did not constitute vouching because the counselor was a general school psychologist, her interactions with Mary were never characterized as "sexual-abuse" counseling, and the counselor only repeated Mary's statements without offering an opinion. *Id.* at 1033. We also emphasized that the members of the jury had the opportunity to form their own opinion because they could hear the same story from Mary directly during the trial. *Id.*

Like Mary, Kelly also took the stand during the trial and testified directly about the abuse she suffered at the hands of defendant. The jury had ample opportunity to form an independent opinion about Kelly's credibility during her long testimony. This extended testimony far outweighed the neutral, brief, and offhanded mention by her mother that they had talked about the events "in .counseling," without further information about the nature and extent of this counseling. We conclude, therefore, that, even if the trial justice's clear curative instruction had not been given, the jury could not reasonably construe the mother's testimony as vouching for Kelly's.credibility. Accordingly, we are satisfied that the trial justice did not abuse his discretion by denying defendant's motion for mistrial.

■ The defendant, likewise, contends that the curative instruction given by the trial justice was insufficient to undo any harm caused by the reference to counseling. He cites *State v. Ordway,* 619 A.2d 819 (R.I.1992), for the proposition that the "naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fiction." *Id.* at 828 (quoting *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J. concurring)). "The well was poisoned and the bell rung, and the resulting effects cannot be altered." *Id.*

■ Although we are satisfied that the curative instruction given by the trial justice in this case was quite comprehensive and sufficient to offset the mother's remark, we also note that defendant failed to preserve this issue for appellate review. "As established by this court, an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review." *State v. Gomez,* 848 A.2d 221, 237 (R.I.2004) (quoting *State v. Donato,* 592 A.2d 140, 141 (R.I.1991)); *accord State v. Markarian,* 551 A.2d 1178, 1183 (R.I.1988) ("claims of error are deemed waived unless the specific grounds for the claimed error are effectively raised at trial"). This directive specifically to object to errors at trial, the "raise-or-waive rule," is well established, and will not be disturbed unless "basic constitutional rights are concerned." *Donato,* 592 A.2d at 141.

■ In the present case, defendant's counsel immediately objected to the mother's testimony. She then moved for a mistrial, saying: "I'd ask the Court to consider a motion for mistrial with reference to the counseling remark. * * * If your Honor declines to do that, I would ask for a curative instruction for the jury

to disregard that. It's not evidence." When the trial justice, after denying the motion for a mistrial, proposed to give a curative instruction, counsel remarked: "I ask that you do that and I ask that they not consider or speculate why she's in counseling or what she discusses in counseling. There's been no evidence to that." The trial justice then proceeded to give the curative instruction, after which the direct examination of Kelly resumed. At no time did defendant object to the trial justice's instruction to the jury. The trial justice, moreover, delivered exactly the kind of instruction counsel had asked for, telling the jury "you're not to speculate about the question or the answer or about the witness' response about counseling, or anything to do with counseling." As a result, we conclude that defendant failed to preserve for review any issue concerning the adequacy of the trial justice's curative instruction.

## Motion for Judgment of Acquittal

In his second point on appeal, defendant argues that the trial justice erred when he denied defendant's motion for judgment of acquittal. The defendant asserts that the state was unable to meet the elements of count 1 of the indictment charging that he "did engage in sexual penetration, to wit, cunnilingus, with [ ], a person under fourteen (14) years of age, in violation of § 11–37–8.1 and § 11–37–8.2." [3]

The relevant statute is § 11–37–8.1 entitled "**First degree child molestation sexual assault**," which says that "[a] person is guilty of first degree child molestation sexual assault if he or she engages in sexual penetration with a person fourteen (14) years of age or under." The parties agree that the victim was under fourteen years of age at the time the incident occurred.

The term "sexual penetration" is defined in § 11–37–1(8) as:

"sexual intercourse, cunnilingus, fellatio, and anal intercourse, or any other intrusion, however slight, by any part of a person's body or by any object into the genital or anal openings of another person's body, or the victim's own body upon the accused's instruction, but emission of semen is not required."

The defendant argued during his trial and repeats on appeal that sexual penetration in fact requires actual penetration. He bases his argument on the language of § 11–37–1(8), which says in part that sexual penetration means "sexual intercourse, cunnilingus, * * * or any other intrusion, however slight * * *." The defendant urges us to interpret the statute to mean that cunnilingus, therefore, requires an actual intrusion into the victim's body beyond the labia to the vulva or clitoris, even though penetration into the vaginal canal is not required. He says that Kelly's testimony established that defendant "sucked her 'private' only on the 'outside,' and she made no assertion that he used his tongue." Kelly testified at trial that defendant "was sucking on my private." She could not remember, however, whether defendant also used his tongue. The defendant contends, therefore, that the evidence at trial failed to establish the element of sexual penetration. Furthermore, he argues that the trial justice erred in finding that "[a]natomically speaking, it's clear that that area, as she described it as where she would go to the bathroom, is actually part of her internal genitalia" and that,

---

**3.** The defendant did not request an instruction on the lesser-included offense of second-

degree child molestation sexual assault.

therefore, the trial justice erred in denying his motion for judgment of acquittal.

 "In reviewing a claim of legal sufficiency of the evidence in the context of a motion for a judgment of acquittal, this Court applies the same standard as that applied by the trial court, namely, '[we] must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Otero*, 788 A.2d 469, 475 (R.I.2002) (quoting *State v. Snow*, 670 A.2d 239, 243 (R.I.1996)). "Clearly, '[t]he standard applied to a motion for judgment of acquittal requires less in the way of evidence than the standard applicable to a motion for a new trial.'" *Id.* (quoting *State v. Salvatore*, 763 A.2d 985, 989 (R.I.2001)).

In *State v. Cembrola*, 469 A.2d 362 (R.I. 1983), we held that the facts had established an act of cunnilingus. In the context of that case, we added, however, that "the testimony 'and he used his tongue' [was] not without significance." *Id.* at 366. However, we clarify today that the establishment of an act of cunnilingus does not depend upon proof of the use or nonuse of a defendant's tongue.

Sexual penetration, as defined in § 11–37–1(8), specifically includes the act of cunnilingus. *Cembrola*, 469 A.2d at 365. "Cunnilingus" is commonly defined as "[o]ral stimulation of the clitoris or vulva." American Heritage Dictionary of the English Language 444 (4th ed., Houghton Mifflin 2000). The "vulva" is defined as "[t]he external genital organs of the female, including the labia majora, labia minora, clitoris, and vestibule of the vagina." *Id.* at 1931. Likewise, Black's Law Dictionary defines "cunnilingus" as "[a]n act of sex committed with the mouth and the female sexual organ." Black's Law Dictionary 380 (6th ed. 1990). These defini-

tions suggest that the act of cunnilingus is accomplished as soon as the mouth comes in contact with any part of the female genitalia. This is precisely the result we have reached in our previous decisions. We held that cunnilingus "does not require actual vaginal penetration." *State v. Beaulieu*, 674 A.2d 377, 378 (R.I.1996) (citing *Cembrola*, 469 A.2d at 366). We furthermore stated that "the act of cunnilingus * * * assumes the necessary penetration or intrusion into the female genitalia." *Id.* (citing *State v. Cassey*, 543 A.2d 670 (R.I.1988)).

 Because the act of cunnilingus assumes a penetration or intrusion into the female genitalia, the issue of whether defendant used his tongue in committing the act loses its significance. Kelly's testimony established that defendant touched her genitalia with his mouth when he sucked on her private part. This is sufficient to constitute cunnilingus. Therefore, the evidence presented by the state was sufficient to overcome a motion for judgment of acquittal, and the trial justice was correct to deny defendant's motion.

In addition, if cunnilingus assumes a penetration or intrusion into the female genitalia, defendant's statutory argument must fail. He said that because "sexual penetration" in § 11–37–1(8) means "cunnilingus * * * or any *other* intrusion," some form of penetration or intrusion beyond the external sexual organs is required to establish cunnilingus. (Emphasis added.) Because cunnilingus assumes this intrusion or penetration, any perceived inconsistency in the statutory language is rendered moot.

The result we are reaching today is also supported by opinions from other jurisdictions. The Court of Appeals of South Carolina followed our reasoning in *Beaulieu* and *Cassey* in a recent decision and held that cunnilingus does not require actual vaginal penetration. *State v. Morgan*,

352 S.C. 359, 574 S.E.2d 203, 208 (Ct.App. 2002). The Supreme Court of North Carolina said that cunnilingus will be found if any part of the vulva is stimulated orally. "We are satisfied the Legislature did not intend that the vulva in its entirety or the clitoris specifically must be stimulated in order for cunnilingus to occur." *State v. Ludlum*, 303 N.C. 666, 281 S.E.2d 159, 162 (1981).

Decisions from the highest courts in Mississippi and Nebraska even specify "sucking" as one of the actions that will constitute cunnilingus and will suffice to establish sexual penetration if the mouth and the female sex organ are involved. The Supreme Court of Nebraska observed that "sexual penetration" is defined to "include cunnilingus, an act which * * * includes licking, kissing, sucking, or otherwise fondling the sex organ of the female with the mouth or tongue. By its very definition the act of kissing the sex organ of a female, which is the act of cunnilingus, constitutes sexual penetration * * *, even though there is not in fact intrusion into the body." *State v. Piskorski*, 218 Neb. 543, 357 N.W.2d 206, 211–12 (1984).

Likewise, the Supreme Court of Mississippi held that "proof of contact, skin to skin, between a person's mouth, lips, or tongue and the genital opening of a woman's body, whether by kissing, licking, or sucking, is sufficient proof of 'sexual penetration' through the act of 'cunnilingus.'" *Johnson v. State*, 626 So.2d 631, 633–34 (Miss.1993).

We conclude, therefore, the evidence that the state presented in this case was sufficient to withstand a motion for judgment of acquittal. The judgment of conviction is affirmed and the papers in the case are remanded to the Superior Court.