**STATE**

v.

**James ENOS.**

**No. 2010–54–C.A.**

Supreme Court of Rhode Island.

June 17, 2011.

Aaron L. Weisman, Department of Attorney General, for State.

Paula Rosin, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

This case came before the Supreme Court on May 10, 2011, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and reviewing the memoranda of the parties, we are satisfied that cause has not been shown. Accordingly, we shall decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

An incident of violence that occurred during the winding down of a couple's romantic relationship is at the root of this appeal. The defendant, James Enos, met a young woman named Mary on the popular dating website, Match.com, in January

2008. The couple hit it off and began to date. During the course of their time together, James and Mary had an intimate relationship. After six months, however, the relationship had run its course, and Mr. Enos broke it off in August 2008. Shortly after the breakup, Mr. Enos contacted Mary to ask her to return some jewelry that he had given to her. Because her attempt to mail him the jewelry was unsuccessful, Mary agreed to meet Mr. Enos at a restaurant in Wakefield to make the exchange. After both arrived at the restaurant, Mr. Enos suggested, and Mary agreed, that the couple go inside for a drink. They conversed pleasantly for more than an hour; however, the conversation then soured and defendant began swearing at Mary.[1] The young woman tried to leave the table, but defendant grabbed her from behind in a "bear hug" and began hitting her on the head with drinking glasses. The glasses shattered and Mary fell to the floor. However, Mr. Enos continued to assault her by kicking her until restaurant employees restrained him and pulled Mary to safety.[2] The police were called to the scene; the first officer to arrive encountered Mr. Enos outside the restaurant lying on the ground and holding his left hand, which was bleeding profusely. As the officer approached, Mr. Enos "uttered 'oh, my God, what have I done? What have I done?' " The police officer subsequently read Mr. Enos his *Miranda* rights and arrested him.

On December 8, 2008, James Enos was charged by information in the Superior Court for Washington County with one count of assault with a dangerous weapon, namely a drinking glass, in violation of G.L.1956 § 11–5–2 and G.L.1956 § 12–29–5.[3] At trial, seven witnesses, including Mary, four of the restaurant's patrons and employees, and both of the responding police officers, testified before a jury. At the conclusion of the trial, defendant was convicted of domestic assault with a dangerous weapon. He was sentenced to twenty years in prison with eighteen months to serve and eighteen and one-half years probation, ordered to have no contact with Mary, to pay restitution to her, and to attend a mental-health program, substance-abuse counseling, and batterers' intervention. Mr. Enos filed an appeal to this Court.[4]

Before us, defendant presses two arguments: First, he contends that the evidence presented by the state was legally insufficient for a reasonable juror to conclude that Mr. Enos and Mary were in a domestic relationship, and thus that the trial justice erred when she denied Mr.

---

1. It appears that the couple was arguing over some aspect of Mary's job as a student-nurse.

2. As a result of the attack, Mary received ten stitches to close the wounds on her scalp, and she suffered mental and emotional trauma.

3. General Laws 1956 § 11–5–2 is the felony assault statute. General Laws 1956 chapter 29 of title 12 is the Domestic Violence Prevention Act. A second count, one of intentionally, knowingly or recklessly engaging in fighting, threatening, violent, or tumultuous behavior, was dismissed prior to trial.

4. Because Mr. Enos filed his appeal prior to the entry of the judgment of conviction and commitment, the appeal was premature under Article I, Rule 4(a) of the Supreme Court Rules of Appellate Procedure. The defendant was sentenced on October 2, 2009. He filed his notice of appeal on October 5, 2009, but judgment did not enter until November 30, 2009. This Court has held, however, that an appeal filed after an oral decision but prior to the entry of final judgment may be treated as timely in the interests of justice and to avoid undue hardship. *Fossa v. Fossa*, 869 A.2d 58, 59 n. 2 (R.I.2005) (citing *Russell v. Kalian*, 414 A.2d 462, 464 (R.I.1980)); *United Lending Corp. v. City of Providence*, 827 A.2d 626, 631 n. 9 (R.I.2003). We, therefore, treat this appeal as timely.

Enos's motion for acquittal under Rule 29 of the Superior Court Rules of Criminal Procedure. Second, he argues that the trial justice erred when she refused to declare a mistrial after a police officer testified that after defendant was informed of his *Miranda* rights, he declined to provide information about the incident to the police.

# I

## The Question of a Domestic Relationship

### A

### Standard of Review

 When this Court reviews motions for judgment of acquittal, it applies the same standard as the trial justice.[5] *State v. Brown*, 9 A.3d 1232, 1237 (R.I.2010); *State v. Caba*, 887 A.2d 370, 372 (R.I.2005); *State v. Forbes*, 779 A.2d 637, 641 (R.I. 2001). As such, we "must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, and draw therefrom every reasonable inference consistent with guilt." *State v. Mercado*, 635 A.2d 260, 263 (R.I.1993); *accord Forbes*, 779 A.2d at 640. "If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for the judgment of acquittal must be denied." *Forbes*, 779 A.2d at 641 (citing *State v. Laperche*, 617 A.2d 1371, 1373 (R.I.1992)); *see Brown*, 9 A.3d at 1237; *State v. Hornoff*, 760 A.2d 927, 932 (R.I.2000).

**5.** Rule 29(a)(1) of the Superior Court Rules of Criminal Procedure, motion for judgement of acquittal before submission to the jury, says in pertinent part:

"The court on motion of a defendant or on its own motion shall order the entry of

### B

### The Parties Were in a Domestic Relationship

The jury found defendant guilty of violating § 11–5–2, namely felony assault. Section 11–5–2(a) provides that "[e]very person who shall make an assault or battery, or both, with a dangerous weapon * * * shall be punished by imprisonment for not more than twenty (20) years." Section 11–5–2(b) also says that "[w]here the provisions of the 'Domestic Violence Prevention Act' * * * are applicable, the penalties for violation of this section shall also include penalties as provided in § 12–29–5." Section 12–29–2 provides the definitions that inform § 12–29–5. Specifically, § 12–29–2(a) defines "domestic violence" as "includ[ing], but * * * not limited to, [a felony assault] when committed by one family or household member against another * * *." "Family or household member" is defined as

"spouses, former spouses, adult persons related by blood or marriage, adult persons who are presently residing together or who have resided together in the past three (3) years, and persons who have a child in common regardless of whether they have been married or have lived together, or if *persons who are or have been in a substantive dating or engagement relationship within the past one year which shall be determined by the court's consideration of the following factors:*

"(1) the length of time of the relationship;

"(2) the type of the relationship;

judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses."

"(3) the frequence [*sic*] of the interaction between the parties." Section 12–29–2(b) (emphasis added).

As soon as the state rested after presenting its evidence, defendant moved for a judgment of acquittal based on Rule 29 concerning the issue of the existence of a "domestic relationship." He argued that the state had failed to present any evidence concerning the frequency of the interactions between the couple and that Mary's testimony that the relationship was an intimate one failed properly to describe the nature of the relationship. In short, defendant argued that the testimony had been too conclusory for a reasonable juror to find that the parties were in a domestic relationship. The trial justice denied defendant's motion.

This Court has not yet had an opportunity to consider what minimum facts serve as a foundation for a conclusion that a couple has been in a "substantive dating * * * relationship" under § 12–29–2. This is, by its very nature, a somewhat flexible concept. Other jurisdictions that have considered this issue also have struggled in determining whether the parties are in a dating relationship, even when statutory factors are delineated for the courts' consideration (as they are here). *See, e.g., Hobdy v. State*, 919 So.2d 318, 322–25, 325 (Ala.Crim.App.2005) (looking to six factors that might be suggestive of a dating relationship, but concluding that such factors are "not exhaustive" and "must allow for the consideration of additional facts and/or factors that may be relevant"); *Oriola v. Thaler*, 84 Cal. App.4th 397, 100 Cal.Rptr.2d 822, 827–32, 832 (2000) (noting the difficulty posed by a lack of a statutory definition of "dating relationship" and looking to myriad factors considered by other states, including Rhode Island, to conclude that a dating relationship means a "serious courtship"); *People v. Disher*, 224 P.3d 254, 256–58 (Colo.2010) (holding that a couple need not have a sexual relationship in order for an "intimate relationship," to exist under a state domestic violence statute); *C.O. v. M.M.*, 442 Mass. 648, 815 N.E.2d 582, 586, 586–88 (2004) (concluding that a state statute that listed four factors to be considered in determining the existence of a substantive dating relationship was written "with purposeful flexibility in its definitions").

▮ We begin our own analysis by noting that the General Assembly has enunciated that the intent of this particular statute "is to recognize the importance of domestic violence as a serious crime against society and to assure victims of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide." Section 12–29–1(a).[6] "[A]s final arbitrator on ques-

---

6. Section 12–29–1 goes on to note the prior lax enforcement of criminal statutes in situations in which the parties involved were in a domestic relationship:

"(b) While the legislature finds that the existing criminal statutes are adequate to provide protection for victims of domestic violence, previous societal attitudes have been reflected in policies and practices of law enforcement agencies, prosecutors, and courts which have resulted in differing treatment of crimes occurring between family or household members and of the same crimes occurring between strangers. Only recently has public perception of the serious consequences of domestic violence to society and to the victims led to the recognition of the necessity for early intervention by law enforcement agencies.

"(c) It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated. Furthermore, it is the intent of the legislature that criminal laws be enforced without regard to whether

tions of construction, it is this [C]ourt's responsibility in interpreting a legislative enactment to determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *State v. Badessa*, 869 A.2d 61, 65 (R.I. 2005) (quoting *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987)). "That intent is discovered from an examination of the language, nature, and object of the statute." *Ryan v. City of Providence*, 11 A.3d 68, 71 (R.I.2011) (quoting *Berthiaume v. School Committee of Woonsocket*, 121 R.I. 243, 247, 397 A.2d 889, 892 (1979)). "When we determine the true import of statutory language, it is entirely proper for us to look to 'the sense and meaning fairly deducible from the context.'" *Id.* (quoting *In re Brown*, 903 A.2d 147, 150 (R.I.2006)). "[I]t would be 'foolish and myopic literalism to focus narrowly on' one statutory section without regard for the broader context." *Id.* (quoting *In re Brown*, 903 A.2d at 150).

■ The statute directs the court to look to three factors (length, nature, and frequency) as indicative of the substance of the relationship as a whole.[7] The statute does not require a specific demonstration of each of the factors, nor does it limit the court to only those three factors. After all, the essential and core task of the trial justice is to determine whether the evidence is capable of proving the existence of a substantive dating relationship. It is that determination that is the primary focus; the enumerated factors serve to guide the court's considerations in making that determination. Requiring specific findings about the precise number of times two

people saw each other before reaching a conclusion that the parties are in a substantive dating relationship is not required by the statute, nor does it support the legislative intent.

■ When she ruled on the motion, the trial justice considered the testimony offered by the victim that (1) the couple started dating in January 2008, (2) they met through a dating website, (3) they had an intimate relationship, (4) defendant had terminated the relationship within a couple of weeks preceding the assault,[8] (5) they had had communication since the breakup "relative to affairs of the heart," and (6) the parties met that night in August so that the victim could return jewelry defendant had given her during the course of their relationship. Officer Joshua Eidam testified that defendant said at the scene that he had "an argument with his girlfriend."

Although Mary did not offer specific evidence about the number of times each week or month she saw defendant, she did testify that the couple dated for six months. From this, combined with other evidence (*e.g.*, defendant referring to Mary as his girlfriend), a reasonable juror certainly could infer that the couple saw each other on a regular basis over a period of six months. When she was asked if the relationship was "an intimate relationship," Mary testified that "it was." It is clear to us that this statement is evidence of the *nature* of the interactions between the parties. Therefore, we are satisfied that the trial justice considered the nature of the interactions as well.

---

the persons involved are or were married, cohabitating, or involved in a relationship."

**7.** The American Heritage Dictionary of the English Language 463 (4th ed. 2009) defines "dating" as "[t]o go on a date or dates with," and defines "date" as "[a]n engagement to go

out socially with another person, often out of romantic interest." It defines "relationship" as "[a] romantic or sexual involvement." *Id.* at 1473.

**8.** At the trial, Mary testified that Mr. Enos had "broke[n] up with" her.

We agree with the trial justice's conclusion that the evidence, overall, indicated that Mr. Enos and Mary were in a substantive dating relationship. We are convinced that the trial justice viewed the evidence in the light most favorable to the state, as was her task, and correctly denied defendant's motion for a judgment of acquittal. *See Forbes,* 779 A.2d at 640–41; *Mercado,* 635 A.2d at 263.

## II

### Post-*Miranda* Silence

#### A

#### Standard of Review

■■ "A trial justice's decision to deny a motion for a mistrial is accorded great weight and will not be disturbed on appeal unless it is clearly wrong." *State v. Higham,* 865 A.2d 1040, 1044 (R.I.2004) (quoting *State v. Lynch,* 854 A.2d 1022, 1033 (R.I.2004)). "The trial justice 'has a front-row seat at the trial' and is in the best position to determine whether a defendant has been unfairly prejudiced." *State v. Luciano,* 739 A.2d 222, 228 (R.I.1999) (quoting *State v. Gomes,* 690 A.2d 310, 317–18 (R.I.1997)). When considering a motion for a mistrial, "the trial justice must determine whether the evidence

would cause the jurors to be so inflamed as to make them unable to decide the case on the basis of the evidence presented." *Id.* (citing *State v. Mastracchio,* 672 A.2d 438, 444 (R.I.1996)).

#### B

### Defendant Was Not Prejudiced by Witness's Remark and Jury Instruction Was Proper

In a series of cases, the United States Supreme Court has restricted prosecutors, judges, and witnesses from commenting on, or even mentioning, a defendant's decision to remain silent after that defendant was informed of his or her *Miranda* rights.[9] The Court reasoned in *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." The defendant contends that the trial justice should have granted his motion for a mistrial after a witness, Officer Joshua Eidam, offered unprompted testimony that "after [he] advised [defendant] of his *Miranda* rights [defendant] declined to give [the officer] any information."[10] In essence, defendant argues that

---

9. *See, e.g., Doyle v. Ohio,* 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (holding that the use of a defendant's post-arrest silence could not be used to impeach a defendant because it violated that defendant's due process rights); *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (holding that a prosecutor's comments about a defendant's failure to testify about matters of which he or she has knowledge and comments by the court that the defendant's silence can be construed against the defendant violate the Fifth Amendment); *cf. United States v. Robinson,* 485 U.S. 25, 31–32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (holding that when the defendant's attorney first suggested that the government had prevented the defendant from giving "his side of the story," the prosecutor's comments that the defendant

could have but chose not to testify did not violate the defendant's Fifth Amendment rights).

10. The witness, Officer Joshua Eidam testified in relevant part as follows:
 "Q While he was being treated by EMS, did you advise him of any rights?
 "A Immediately upon them securing the wound, I observed his hand and Mirandized him."
 "* * *
 "Q At that point, did the Defendant say anything to you?"
 The defendant's attorney objected at this point, but withdrew his objection after a bench conference.
 "Q After he received that initial treatment for his hand from EMS and you advised

he was prejudiced by the officer's testimony after he exercised the right to remain silent. The trial justice declined to grant defendant's motion and instead instructed the jury as follows: "After Mr. Enos was administered *Miranda* rights, if you find that to be the case, you should know he had the right to remain silent if he chose to remain silent. That cannot be used against him."

■ In *Higham*, 865 A.2d at 1046–47, this Court considered a similar situation—albeit one not involving *Miranda*. During the trial of Mr. Higham on charges that he sexually molested his step-granddaughter, the victim's mother responded to a question put to her about whether the victim had spoken to her about the incident; the mother replied, "in counseling." *Id.* at 1044. The defendant's counsel objected. *Id.* The trial justice sustained the defendant's objection and struck the witness's comment from the record. *Id.* Counsel then moved for a mistrial, or in the alternative, an instruction to the jury that it was to disregard the remark. *Id.* The trial justice denied the motion for mistrial, but did provide the jury with a curative instruction. *Id.* On appeal, the defendant alleged error in the trial justice's denial of

his motion to pass because the reference to counseling constituted impermissible vouching for the complaining witness's credibility and, therefore, was prejudicial to the defendant. *Id.* This Court observed that "much hinged on the issue of the complaining witness's credibility." *Id.* at 1045. It went on to note that because determining the credibility of a witness is entirely within the province of the jury, the testimony of another witness that would have " 'substantive import' " on assessing the credibility of the complaining witness should not be admitted. *Id.* The Court concluded, however, that Mr. Higham was not prejudiced by only one brief reference to the complaining witness's counseling session. *Id.* Moreover, the line of questioning ceased immediately; and, significantly, after denying the motion for a mistrial, "the trial justice immediately proceeded to give the * * * curative instruction to the jury." *Id.* at 1045–46. The jury instruction "was quite comprehensive and sufficient to offset the mother's remark." [11] *Id.* at 1046.

■ Here, the witness made an unprompted, unsolicited remark that the defendant remained silent after he had been informed of his *Miranda* rights. While

him of his Miranda rights, did the Defendant make any statements to you about what happened in the bar?
"A No.
"Q Did he say anything to you about his—
"[Defendant's attorney]: Objection, your Honor. This is getting leading at this point. The officer said no.
"THE COURT: Sustained.
"A Can I speak?
"Q I'll withdraw the question, your Honor. What did you do next?
"A After?
"Q After you advised him of his Miranda rights.
"A After I advised him of his Miranda rights he declined to give me any information.

"[Defendant's attorney]: Objection, move to strike and I have a motion.
"THE COURT: Answer stricken and should be disregarded. Come up."

11. The state argues that Mr. Enos waived his objection by failing to renew it in light of the trial justice's decision to instruct the jury to disregard Officer Eidam's remarks. The Court in *State v. Higham*, 865 A.2d 1040, 1046–47 (R.I.2004), noted that the defendant failed to preserve the issue for review because the defendant's attorney *requested*, and the trial justice gave, a curative instruction to the jury. But, Mr. Enos's attorney did not request a jury instruction as an alternative to declaring a mistrial, and thus did not waive his right to appeal the denial of his motion for a mistrial.

this remark certainly implicates the defendant's right to remain silent, any prejudice that may have arisen swiftly was foreclosed by the trial justice's immediate and thorough instruction to the jury. Thus, we do not agree with Mr. Enos's assertion that "the prejudice resulting from this inadmissible evidence—*i.e.*, the likelihood that the jurors would infer from his silence a tacit admission of guilt—would not have been dispelled by the trial court's instruction." In our view, the witness's comment was not one that would so "inflame" the jurors to the extent that they could not reach an unimpassioned decision by looking solely at the evidence that was properly before them. The trial justice was not clearly wrong when she denied the defendant's motion for a mistrial and instead opted to instruct the jury to disregard the errant remark.

### Conclusion

For the reasons articulated above, we affirm the judgment of the Superior Court. The papers in this case shall be returned to that tribunal.

Justice GOLDBERG, concurring and dissenting.

I respectfully dissent from that portion of the majority's opinion holding that there was legally sufficient evidence to conclude that defendant and Mary were in a domestic relationship. I cannot concur with the majority's conclusion that the substantive dating relationship as set forth in G.L.1956 § 12–29–2, which is an essential element of the domestic violence offense, "is, by its very nature, a somewhat flexible concept." Although I agree that, to decide whether a substantive dating relationship exists, an analysis of the factors enumerated in the statute must be undertaken, it is the trial court which must do so as a preliminary matter. I cannot agree that this element of the crime, which must be proven beyond a reasonable doubt, is a "somewhat flexible concept" or that the question is committed to the jury in the first instance. It is well established that "the language of a penal statute must be read narrowly, [and] that penal statutes must be strictly construed in favor of the defendant[.]"[12] *State v. Martini*, 860 A.2d 689, 691 (R.I.2004). Because the testimony elicited in this case provided little to no information about (1) the length of the relationship; (2) the type of relationship; or (3) the frequency of the interaction between defendant and Mary, as set forth in § 12–29–2, I am of the opinion the trial justice erred in denying defendant's motion for a judgment of acquittal concerning the domestic violence crime. I also note that the trial justice failed to address these factors in her ruling denying defendant's motion for a judgment of acquittal and concluded that this was a question solely for the jury's determination. This was error in my opinion. I would remand this case with directions to enter a judgment of conviction for the crime of felony assault and for a new sentencing hearing respecting that conviction.

The record discloses that Mary was the first witness to testify at trial. During her direct examination, the state engaged in a short colloquy about the nature of Mary's relationship with defendant:

"Q How do you know James Enos?

"A We were in a relationship.

"Q When did you meet?

"A In January of 2008.

"Q And how did you meet?

12. Of note, this Court has not yet been confronted with a challenge to G.L.1956 § 12– 29–2 on vagueness grounds.

"A Match.com.

"Q You met Mr. Enos in January and began dating him at that time?

"A At the end of January.

"Q And how long did you date him for?

"A About six months.

"Q And was it an intimate relationship?

"A Yes, it was.

" * * *

"Q When did your relationship with Mr. Enos end?

"A In the beginning of August.

"Q And who broke up with [whom]?

"A He broke up with me."

The state did not elicit any further information about Mary's relationship with defendant from her, or from any other witness. The foregoing testimony was the only evidence relative to this element of the crime. The fact that they dated for six months and were intimate is not enough in my opinion.

This evidence virtually provided no information about two of the three factors the trial justice must consider in determining whether there existed a substantive dating relationship—namely, the type of relationship, and the frequency of the interaction between defendant and Mary. The complainant testified that she and defendant dated for six months, but she did not explain how often they saw each other, or whether it was a mutually exclusive relationship or whether they also were dating other people. Although she testified that they were "intimate," the Random

House Unabridged Dictionary 1000 (1993) assigns no less than thirteen different meanings to the word "intimate." Clearly, in the context of this case, it is reasonable to assume the witness was referring to sexual relations. Sexual intimacy, however, may consist of casual sex or sex for convenience. It may or may not indicate a serious relationship; "human experience teaches that sexual intimacy does not necessarily reflect a romantic interest, * * * and a romantic relationship need not involve sexual intimacy." *Oriola v. Thaler*, 84 Cal.App.4th 397, 100 Cal.Rptr.2d 822, 831 (2000).

The majority concludes that a reasonable juror could infer from Mary's testimony that she and defendant "saw one another on a regular basis over a period of six months." I am not convinced. Additionally, the majority finds that Mary's testimony that she and defendant were "intimate," constitutes sufficient evidence about "the *nature* of the interactions between the parties." Although I agree that the statute does not require a specific showing on each of the enumerated factors set forth in § 12–29–2, in my opinion, Mary's scant testimony does not reasonably support the dual inferences that she and defendant saw each other on a regular basis and that the relationship was of a serious nature. The drawing of these inferences would stretch the evidence beyond its breaking point. "This Court is not in the business of supplying essential elements of a felony offense by implication." *State v. Carter*, 827 A.2d 636, 643 (R.I.2003).[13]

---

**13.** This is not the first time this Court has addressed the piecemeal fashion in which this state's domestic violence legislative scheme has been crafted. In *State v. Carter*, 827 A.2d 636, 642 n. 8 (R.I.2003), this Court noted: "We remain concerned about the inconsistencies in the Domestic Abuse Protection Act, chapter 15 of title 15, the Domestic

Assault Act, G.L.1956 chapter 8.1 of title 8, and the Domestic Violence Prevention Act, title 29 of chapter . 12. This statutory scheme, enacted by the General Assembly over a period of years, contains troubling jurisdictional inconsistencies and contradictions and reflects a patchwork approach to

Further, and critically in my opinion, the trial justice did not address the factors set forth in the statute, but concluded that it was a question for the jury. In response to defendant's motion for judgment of acquittal, the state argued that Mary's testimony established a substantive dating relationship; the state's argument consisted of the following:

> "[The defendant and Mary] met on a dating website called Match.com. She testified that [they] dated for six months, that they had been intimate during that relationship, that the [d]efendant had terminated the relationship within a couple of weeks preceding [the alleged assault] and that they had communicat[ed] since the breakup relative to affairs of the heart, the return of the jewelry, winding down their relationship."

The trial justice's ruling was as follows:

> "Given the evidence that was just outlined by [the state], this [c]ourt cannot say as a matter of law that the [s]tate could not prove this to be a domestic offense beyond a reasonable doubt. *I believe it's a question for the jury pursuant to the statute* and I intend to instruct them and submit that question to them." (Emphasis added.)

I am of the opinion that the trial justice's failure to consider the factors enumerated in § 12–29–2 was error. The statute explicitly provides that the factors are for the court's consideration.

Unquestionably, our sister states have struggled to determine the factors that characterize a dating relationship. Notably, our statute requires a substantive dating relationship. The California Court of Appeals has stated that a dating relationship:

> "[I]s a social relationship between two individuals who have or have had a re-

ciprocally amorous and increasingly exclusive interest in one another, and shared expectation of the growth of that mutual interest, that has endured for such a length of time and stimulated such frequent interactions that the relationship cannot be deemed to have been casual." *Oriola,* 100 Cal.Rptr.2d at 832–33.

The Superior Court of New Jersey, Chancery Division, considers a minimum of six factors in determining the existence of a dating relationship, including "the parties' ongoing expectations with respect to the relationship, either individually or jointly[,]" and whether "the parties demonstrate[d] an affirmation of their relationship before others by statement or conduct[.]" *Andrews v. Rutherford,* 363 N.J.Super. 252, 832 A.2d 379, 383, 384 (Ch.Div.2003). Although these factors may vary slightly from our own, the underlying principle is clear; a "substantive dating relationship" simply does not equate with casual dating or casual sex. To trigger the provisions of the Domestic Violence statute, there must be more. The nature of the relationship must establish mutual affection, shared expectations or a growing expectancy, and a frequency of interaction that reflects substance and meaning. The record before us does not contain sufficient evidence to make any such determination. It is thus my view that the trial justice erred in denying the defendant's motion for a judgment of acquittal.

I concur in the Court's conclusion with respect to the trial justice's decision denying the defendant's motion for a mistrial.

ROBINSON, J., concurring in part and dissenting in part.

I concur in the Court's ruling that the trial justice did not abuse her discretion

one of society's most serious ills. It war-

rants comprehensive revision."

when she opted to deny the defendant's motion for a mistrial, choosing instead to give what the Court accurately describes as an "immediate and thorough instruction to the jury."

I respectfully dissent, however, from the Court's holding that the trial justice did not err when she denied defendant's motion for a judgment of acquittal.[14] It is my opinion that the prosecution failed to present sufficient evidence that defendant and Mary had "been in a substantive dating * * * relationship within the past one year * * *." G.L.1956 § 12–29–2(b).

The evidence that the prosecution presented with respect to the existence of such a relationship was, in my view, quite meager, and I believe that it was insufficient to establish that there was a substantive dating relationship between Mary and defendant. Mary testified as to when her relationship with defendant began and when it ended; and she responded affirmatively to the prosecutor's leading question about whether the relationship had been "intimate." There was no further testimony or evidence about the relationship between Mary and defendant.

I respectfully submit that the just-referenced evidence was insufficient to support a determination that a substantive dating relationship had existed; too much was left unaddressed. For example, we are not even told how often the two individuals saw each other during the six-month period in question, even though "the frequence of the interaction between the parties" is one of the "factors" that the statute specifically directs be considered. *See* § 12–29–2(b)(3); *see also* Devon M. Largio, *Refining the Meaning and Application of "Dat-*

*ing Relationship" Language in Domestic Violence Statutes,* 60 Vand. L.Rev. 939, 965 (2007).

For these reasons, I believe that there was insufficient meaningful evidence as to the existence of a substantive dating relationship. Accordingly, I believe that the defendant's motion for a judgment of acquittal with respect to that issue should have been granted.

---

**14.** Although neither party has challenged the fact that the question of whether or not there was a substantive dating relationship was submitted to *the jury,* I would hope that this Court will have occasion in another case to pass upon the propriety of such a submission to the jury in view of the fact that the statute indicates that it is the court's role to make such a determination.