**Supreme Court**

No. 2014-149-C.A.
(P2/12-1929ADV)

| | | |
|---|---|---|
| State | : | |
| v. | : | |
| Jose A. Breton. | : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                      :

v.                                      :

Jose A. Breton.                          :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**   Early in the morning of October 25, 2011, as she was leaving for work, the complaining witness, Dilcia Lora, was viciously attacked by a masked assailant in the front hall of her home and was severely cut on her face with a small blade. Ms. Lora subsequently identified her attacker as the defendant, Jose A. Breton a.k.a. Pappi Valdez, a man with whom she had previously had a two-year-long romantic relationship.  In a three-count information, the defendant was charged with one count of assault with a dangerous weapon and one count of simple assault on Ms. Lora.  The third count was for a simple assault against Ms. Lora's daughter, Jani Tolentino, which was alleged to have occurred on May 26, 2010.  When the case was reached for trial, the defendant was convicted of the two counts of assault against Ms. Lora, but he was acquitted of the third count against Ms. Tolentino.  The defendant filed a motion for a new trial, which the trial justice denied.[1]  It is from that ruling that the defendant has timely appealed, arguing that the trial justice misconstrued the evidence when

---

[1] On count 1 defendant was sentenced to twenty years, eleven to serve, nine years suspended, with nine years of probation.  On count 2, he was sentenced to one year to serve, suspended with probation to run concurrently with count 1.

he found Ms. Lora to be a more credible witness than the alibi witnesses produced by the defendant. We have examined the record and have considered the written submissions and oral arguments advanced by the parties. For the reasons set forth in this opinion, we affirm the judgment of conviction.

## Facts and Travel

On May 26, 2010, Ms. Lora and defendant had an argument, during the course of which defendant struck and pushed Ms. Lora's daughter, Jani Tolentino. The police were called, but when they arrived, Ms. Lora told them that she did not know defendant's real name, only his alias, "Pappi Valdez," and that they had been dating for only three months when in fact they had been dating for two years. At trial, Ms. Lora explained that she had not been truthful with the police because she was afraid of what defendant would do if she reported him to law enforcement.

According to Ms. Lora, she and defendant had been in a two-year relationship that had been replete with assaults and threats. The romance, she said, came to an end in December 2010. However, Ms. Lora said that she never explained to defendant that the relationship was over and that she never "officially" broke up with him, but instead she simply left the country. Ms. Lora said that she went to the Dominican Republic to stay with her mother, remaining there for approximately two months. Ms. Lora did not tell defendant she was leaving the country or where she would be going, nor did she inform her mother why she had come to stay. However, shortly after she got to the Dominican Republic, defendant showed up at her mother's house, unexpected and uninvited. The defendant repeatedly asked Ms. Lora to resume their relationship and he promised to enter counseling. But Ms. Lora was unmoved, and, when she refused to get back together with him, he left.

Ms. Lora moved to Florida and then back to Santo Domingo before finally returning to Rhode Island in August 2011. In Rhode Island, she lived with her brother, her sister, her daughter, and her niece and nephew. Eventually, Ms. Lora secured employment at Kenny Manufacturing, where she worked with the mother of defendant's children. Occasionally, she saw defendant as he brought that woman to work but, she explained, she avoided interacting with either of them.

On October 25, 2011, as she was leaving her apartment to go to work, Ms. Lora was accosted by a hooded and masked assailant. Ms. Lora made an effort to defend herself with her hands "so he wouldn't cut [her]" and, during the course of the struggle, she was able to pull part of the mask up. When she did, she recognized defendant's nose and chin. Ms. Lora also recognized the ski mask as belonging to defendant. Ms. Lora screamed for help and attempted to defend herself as the attacker kept slashing at her with the knife. Ms. Lora's brother, niece, daughter, and sister, hearing her screams, rushed to her aid. When they arrived, the assailant ceased attacking Ms. Lora, fled the apartment building and ran down the street. Lisandro, Ms. Lora's brother, chased the assailant out of the building but was unable to catch him. Ms. Lora immediately told her family that "Pappi" had cut her.

At the hospital, Ms. Lora informed the doctors that Jose Breton had cut her face, that she had been in a relationship with him for a long time, that he "always threatened [her]" and that she had never before reported the abuse because she feared that he "would leave [her] paralyzed." She also told the medical personnel that defendant had followed her to the Dominican Republic and had confronted her at her mother's house. Although Ms. Lora related these events to the doctors, she did not immediately notify the police about who had attacked her because she was still afraid of defendant. However, the following day Ms. Lora advised

Det. Emilio Matos of the Providence police department that defendant had assaulted her, that she knew it was him because of his height and build, and that she recognized the "little bit" of his face that had become uncovered when she tugged on the mask. She also explained that "the only person threatening [her] was [defendant]. And he was always threatening [her] if [she] left him he was going to kill [her], this that [sic], that he was going to take [her] eyes out, that he was going to leave [her] paralyzed."

At trial, the attending emergency room physician, Dr. Leo Kowayashi, testified that Ms. Lora presented with three lacerations above her right eye as well as a large deep laceration to the left side of her face, and that these wounds would result in permanent scarring. Ana Cruz, defendant's mother, testified for her son. She said that she had brought defendant to New York City on October 24, 2011, the day before the assault, dropping him off there as she traveled to Virginia for a funeral service for a recently deceased family member. She said that she rented a minivan at the T.F. Green Airport in Warwick, on October 24, 2011, traveled to New York City with defendant, and arrived in Manhattan around 3:30 a.m. on October 25, 2011. Ms. Cruz testified that she left defendant in Manhattan and picked up other family members who were going to the funeral, and that defendant went to stay with her brother's former girlfriend, "Fam," for the day in Brooklyn. Ms. Cruz produced receipts for the rental car, gas, and tolls for the trip to Virginia. She testified that she returned the rental van on October 26, 2011.

Femije Tairi, or "Fam," testified that defendant's mother called her on October 24, and asked if defendant could stay with her because there were too many people going to the funeral and not everyone could afford to go. She said that she met Ms. Cruz and defendant in Manhattan early in the morning on October 25, 2011, and Ms. Cruz picked up other family members; Ms. Tairi said that she then drove with defendant back to her home in Brooklyn, where she lived

with her daughter and two small sons. She testified that she and defendant arrived at her home around 4 a.m., at which point they started talking about the deceased family member and "goofing around like normal families" before making breakfast at about 6 a.m. The defendant's aunt, Marilyn Castillo, arrived around 6:15 a.m. "to grieve," and Ms. Tairi explained that "[w]e have our own way of grieving." According to Ms. Tairi, defendant stayed in Brooklyn until after 10 p.m., at which point she transported him back to Manhattan to meet his mother for the return trip to Rhode Island.[2]

The jury returned a guilty verdict on counts 1 and 2, but acquitted defendant on count 3. When defendant was heard on his motion for a new trial, he argued that the verdict was against the weight of the evidence because it was based primarily on the credibility and reliability of Ms. Lora in identifying defendant as her assailant. The defendant challenged Ms. Lora's ability to identify her attacker, arguing that an accurate identification was impossible given that the attack began and ended in a matter of seconds in a poorly lit stairwell. Additionally, he pointed to the fact that it took her over a day to identify defendant as her assailant to the police after she initially lied to them. And when she finally did, he argued, she did not describe defendant's specific facial features to them. Finally, defendant argued that the state was unable to cast doubt on the unimpeached testimony of his alibi witnesses.[3]

**Standard of Review**

Rule 33 of the Superior Court Rules of Criminal Procedure provides that "[o]n motion of the defendant the court may grant a new trial to the defendant if required in the interest of

---

[2] Ms. Castillo testified that Ms. Tairi had invited her to have breakfast on October 24 as a "family reunion[] [on] the occurrences of my cousin's death." She arrived there with her two children around 6 a.m., when she had breakfast with Ms. Tairi, her nieces, and defendant.

[3] The defendant argued for the first time, in his supplemental Rule 12A statement and at oral arguments before this Court, that the trial justice's decision demonstrated "a cultural bias or ignorance." After reviewing the record, we see no merit to this argument.

justice." The trial justice's role in reviewing a motion for a new trial is that of the proverbial "superjuror" who independently weighs the evidence and assesses the credibility of the witnesses. Battle v. State, 125 A.3d 130, 132 (R.I. 2015). "Specifically, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" State v. Offley, 131 A.3d 663, 674 (R.I. 2016) (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should be affirmed and the motion for a new trial denied." State v. Gregson, 113 A.3d 393, 398 (R.I. 2015) (quoting State v. Mathews, 88 A.3d 375, 388 (R.I. 2014)). In the end, we will not disturb the decision of a trial justice on a motion for a new trial unless the decision is clearly wrong or "the trial justice overlooked or misconceived material and relevant evidence * * *." Battle, 125 A.3d at 132 (quoting Gomes v. Rosario, 79 A.3d 1262, 1265 (R.I. 2013)).

**Analysis**

At the outset of his decision, the trial justice acknowledged that the state's "case rises and falls on the shoulders of the [s]tate's first witness Dilcia Lora." He also said that he had "listened carefully" to defense counsel's arguments and that he did not "overlook the various points made" by him. These included the poor lighting, the fact the assailant was wearing a mask during an attack that occurred in a matter of seconds, Ms. Lora's inability to identify the weapon used, and her refusal to identify defendant or reveal her prior relationship with him. Nonetheless, the trial justice found her to be a credible witness. In so doing, the trial justice, in evaluating her testimony, said he sought to "understand the circumstances, the background, the

- 6 -

relationship, between Ms. Lora and this defendant in weighing, sifting, and evaluating some of the contradictions and omissions * * *."

For that, he looked to Ms. Tolentino's testimony, which he also found credible. Even though defendant was acquitted of the assault charge related to her, the trial justice said that it was helpful that she "did describe the nature of [the relationship between Ms. Lora and defendant] and the dynamics of that relationship and the conduct exhibited by this defendant towards her mother in the period of time leading up to the events related to these specific charges." Finding their testimony to be genuine, he summarized,

> "[t]here is no question in observing those two cases, mother and daughter on this witness stand either it was an academy award acting performance or it was a legitimate and sincere display of fear but there is no question in this [c]ourt's mind, I have not seen witnesses testify in the manner that they testified aside from what they said but the manner of delivery how they positioned themselves on the witness stand, it didn't strike me as contrived or an act. It seemed like a sincere display of their feeling towards this defendant."

The trial justice did not stop there, however, and he went on to address the credibility of the defendant's alibi witnesses, all of whom placed him in New York at the time of the attack. During the defendant's argument on his motion for a new trial, the trial justice specifically questioned the alibi testimony regarding having the family gathering at 6 to 7 a.m. to memorialize a decedent. The trial justice asked defense counsel to address the timing, commenting specifically:

> "[It] just so happened that is exactly the time that this assault occurred. And, of course, they identified the defendant as sitting at the table. I mean, I mean, I know there are different cultures and different ways that people do things and [sic] but isn't that an odd time of day to gather little children and let's all sit around and that is the time you pick to memorialize this person who died.
>
> "* * *

"I just thought it peaked [sic] my interest at the time of the day that took place."

In response, defense counsel dismissed any suggestion that the time of day was odd, reasoning that it was natural under the circumstances to hold a family gathering at that time of the day:

> "So if he arrives 3:30, 4:00 in the morning what is he supposed to go to sleep at four a.m. or something. Of course they are going to be up, and you cook breakfast, you know, young kids have breakfast 6:30 seven in the morning. They get up early. So, again, it was not just, not just a gathering for the memorial it was also to see my client, too. Because the mother was coming into town and they needed to pick my client up. She wasn't going to be staying at the house in Brooklyn. She was driving through. So that is the reason for that time so the time is the trip for Rhode Island time it takes to get to New York, meet them over in Manhattan and instead of more driving to Brooklyn and Manhattan because other people were meeting 191st Street the trip from 191st Street goes back over to Brooklyn and the other aunt came over a little bit later on to meet for breakfast time. I think she arrived little after six she said."

However, the trial justice rejected the testimony of the alibi witnesses when he weighed it against the testimony of Ms. Lora, Ms. Tolentino, and the history of Ms. Lora's relationship with the defendant. The trial justice opined that

> "[w]hen you take that testimony and weigh it against what Ms. Lora and her daughter had to say and the history of that relationship up to that point, I can't say I disagree with the jury's conclusion that the alibi would not be accepted based on the recitation of those witnesses."

We are of the opinion that the trial justice satisfied his obligations when he considered and decided the defendant's motion for a new trial, and that he was well within his discretion when he found the state's witnesses to be credible, despite any inconsistencies in their testimony. See State v. Gonzalez, 56 A.3d 96, 103 (R.I. 2012) ("Even taking into account [the trial justice's] own observations that something was 'being left out,' the trial justice found that the witnesses

- 8 -

were credible * * *."); <u>State v. Jensen</u>, 40 A.3d 771, 781 (R.I. 2012) ("[T]he presence of some inconsistencies between or among utterances of a witness or witnesses at different points in time does not <u>ipso</u> <u>facto</u> render the testimony unworthy of belief.").

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record is remanded to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**     State v. Jose A. Breton.

**CASE NO:**     No. 2014-149-C.A.
               (P2/12-1929ADV)

**COURT:**     Supreme Court

**DATE OPINION FILED:**  May 27, 2016

**JUSTICES:**     Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**     Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**     Providence County Superior Court

**JUDGE FROM LOWER COURT**:

     Associate Justice Daniel A. Procaccini

**ATTORNEYS ON APPEAL:**

     For State:  Virginia M. McGinn
                 Department of Attorney General

     For Defendant:  Layne C. Savage, Esq.
                       Martin D. Harris, Esq.