June 12, 2018

**Supreme Court**

No. 2015-322-C.A.

(P1/14-403A)

State                              :

    v.                             :

Andre Marizan.                     :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                          :

Andre Marizan.                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  A grand jury indicted Andre Marizan (Marizan or defendant) on February 14, 2014 on two counts of first-degree sexual assault in violation of G.L. 1956 §§ 11-37-2(1) and 11-37-3.[1]  After a jury trial in Providence County Superior Court, the defendant was convicted on January 23, 2015.  On appeal, the defendant argues that the prosecutor's closing argument improperly commented on the defendant's failure to testify, thereby violating his Fifth Amendment constitutional rights.  Additionally, the defendant contends that the trial justice erred in admitting the defendant's photograph into evidence and also by denying his motion for new trial.  For the reasons set forth herein, we affirm the judgment of the Superior Court.

---

[1] The state eventually amended count 1 to cover both theories of liability—that the victim was mentally incapacitated and physically helpless.  *See* G.L. 1956 § 11-37-2(1).

# I

## Facts and Travel

The complaining witness, Alicia,[2] testified at trial. She recalled that, on August 18, 2012, after a night of drinking with friends, she woke up next to one of her sister's friends, Marizan. The previous day, Alicia and her sister, Lauren, had gone to a South County beach for a few hours. While there, they consumed Hennessy liquor;[3] and, when the beach closed, they went to Lauren's ex-boyfriend's house in Providence and continued drinking there with a group of Lauren's friends.

Around 8:00 p.m., Alicia, Lauren, defendant, and another friend drove to a clothing store in the Olneyville section of Providence. After shopping, the group went to a liquor store and also picked up some food before returning to the house to join the others. The group of six friends continued drinking well into the night, and Alicia testified that she had planned to sleep at the house.

The party eventually moved from the living room to a bedroom. At some point after 11:00 p.m. but before 3:00 a.m., the group purchased alcohol from a bootlegger.[4] After smoking marijuana and continuing to drink alcohol, Alicia testified that she vomited and later "passed out" on the bed in the bedroom.

When Alicia woke up around 7:00 a.m., she testified that she was not wearing pants or underwear, and she recalled that she also felt a wet substance on her leg.[5] She saw defendant at

---

[2] We use pseudonyms when referencing the complaining witness and her sister.

[3] Hennessy has an alcohol content between eighty and one hundred proof.

[4] A "bootlegger" is a person "who sells alcohol illegally after hours." *State v. Offley*, 131 A.3d 663, 665 n.2 (R.I. 2016).

[5] She also testified that she had a gritty, powdery material on her face. Later, her sister informed her that it was baking soda—the result of a prank perpetrated by the others on Alicia and defendant, while they were sleeping. A video of the prank was recorded on Lauren's phone, and it was shown to the jury at trial.

the corner of the bed and subsequently began "flipping out" on him. Alicia stated that defendant told her she was "bugging" and nothing happened between them—he said that the substance on her leg was urine. Alicia said that defendant told her she had removed her clothing after urinating on herself.

Alicia went to the living room, where her sister and a couple of friends were sitting. Lauren assisted in finding Alicia's clothes. Alicia—who had been a professional boxer—testified that, before she put her clothes back on, she attempted to attack defendant, but was stopped by the friend who lived there. Alicia remembered leaving the house with her sister, who drove her to Women & Infants Hospital in Providence, where a sexual-assault examination was conducted.

At trial, Lauren also testified. She recalled that, a little after 3:00 a.m., she and a few of the friends present that evening had played the prank on Alicia and defendant while they were sleeping, and one person had recorded it on Lauren's cell phone. In the video, three individuals are visible: Lauren, Alicia—who appeared to be passed out—and a third person, whom Lauren identified as defendant. Lauren recalled that, after the video was taken, defendant got out of bed and went to the bathroom to wash his face.

Lauren testified that, when defendant returned to the bedroom, she and two of her friends went back to the living room. Lauren recalled that, after about ten to fifteen minutes, one of her friends attempted to open the bedroom door, but it was locked. When the friend finally found the key to the room, Lauren remembered, she went into the bedroom and found Alicia without her pants on and still asleep. Lauren testified that she observed defendant wearing only boxer shorts, although he had "regular" shorts on earlier in the night.

Lauren stated that, even though she was concerned at that point, she left the room and stayed in the living room until around 6:00 a.m., when she left the house to go to a restaurant with her friends for something to eat. After about thirty minutes to an hour at the restaurant, she returned to the apartment and woke Alicia. At this point, Lauren testified, Alicia started attacking Marizan, and Lauren heard Marizan tell Alicia that she had urinated in a cup and that "nothing happened." Soon after, Marizan left, and Lauren and Alicia went to the hospital.

Amy Corrado was the nurse in the emergency room at Women & Infants Hospital in Providence that day. Corrado testified that she performed a sexual-assault exam on Alicia. She recalled that Alicia had told her that she had showered but was wearing the same clothes she had been wearing the night before. Corrado used swabs to take samples from Alicia's body. She did not find any injuries on her body. Corrado notified the police on Alicia's behalf.

At trial, Detective Joseph Villella testified that he responded to a house in Providence to investigate a suspected sexual assault. Detective Villella collected the bedding from the scene for testing at the Rhode Island Department of Health. Detective William Corrigan also testified regarding his involvement in the case and recalled taking formal statements from both Alicia and Lauren on August 21, 2012. When she gave her statement at the police station, Alicia also identified defendant from a "mug shot"[6] shown to her. A few months later, on October 12, 2012, Det. Corrigan received Marizan's consent to take a buccal swab of his mouth.

However, Det. Corrigan did not obtain an arrest warrant until January 2013, and Marizan was not arrested until August 2013. Moreover, Det. Corrigan testified that he had not taken witness statements from three men who were at the house during the evening of the alleged

---

[6] The "mug shot," as characterized by defendant, portrayed two pictures of defendant next to each other—one of defendant facing the camera and the other a side profile. The admissibility of the "mug shot" is at issue in this appeal.

4

assault because Alicia warned him that the men were defendant's friends and would not cooperate.

At trial, Cara Lupino, the supervisor of the Rhode Island Department of Health Forensic DNA Laboratory, also testified for the state. She explained that the only swab from the sexual-assault examination performed on Alicia at the hospital that tested positive for seminal fluid was the vaginal swab. However, Lupino noted that the seminal fluid did not contain any sperm cells. She also testified that the department received the bedding from the Providence police, and the laboratory tested what was determined to be a bloodstain on a bed sheet for DNA; she concluded that the blood came from a male donor.

In addition, Lupino testified that the laboratory used reference samples from the buccal swab of Marizan and from Alicia's sexual-assault examination. Lupino explained that, in December 2012, the DNA test done on the vaginal swab did not reveal whether the small amount of seminal fluid on the swab was consistent with defendant's DNA profile. Subsequently, however, the laboratory acquired the capability to perform Y-STR testing, which Lupino considered an effective method for this case due to the lack of sperm in the seminal fluid sample and the overwhelming amount of female cells on the vaginal swab. After the testing was conducted, Lupino testified, the results showed that the Y-STR DNA profile from the vaginal swab was consistent with Marizan's Y-STR DNA profile.[7]

During closing arguments, defendant moved for a mistrial, arguing that one of the prosecutor's comments violated his Fifth Amendment right to not testify. The trial justice

_____

[7] "Y-STR's are found only on the Y chromosome; thus, they only appear in males. Because the Y-STR testing ignores the female DNA that often overwhelms the male DNA, it is a helpful method when the sample contains a mixture of both male and female DNA." *People v. Stevey*, 148 Cal. Rptr. 3d 1, 5 (Cal. Ct. App. 2012). However, with Y-STR testing, "it is not possible to identify a particular individual because a male inherits the DNA type from his father and shares the same type with male siblings, uncles, and cousins." *Id.*

reserved decision on the motion for a mistrial. After the trial justice gave general instructions,[8] the jury deliberated, returning with a guilty verdict. Immediately following the verdict, the trial justice denied defendant's motion for a mistrial.

The defendant then moved for a new trial. The trial justice denied the motion and sentenced defendant to forty years, with twenty-five years to serve and fifteen years suspended with probation. He was also required to register as a sex offender and obtain counseling. The defendant timely appealed to this Court.

## II

### Standard of Review

Given the various issues raised on appeal, we outline the standard of review for each issue in turn.

First, when this Court reviews a trial justice's ruling on a motion for a mistrial, we afford the decision "great weight" and reverse only "if it was clearly wrong." *State v. Fry*, 130 A.3d 812, 828 (R.I. 2016) (quoting *State v. Tucker*, 111 A.3d 376, 388 (R.I. 2015)). We acknowledge that a trial justice "has a 'front row seat,' allowing him or her to 'best determine the effect of the improvident remarks upon the jury.'" *State v. McRae*, 31 A.3d 785, 789 (R.I. 2011) (quoting *State v. Tempest*, 651 A.2d 1198, 1207 (R.I. 1995)). As such, when a trial justice rules on a motion for a mistrial, he or she "must determine whether the evidence would cause the jurors to be so inflamed as to make them unable to decide the case on the basis of the evidence presented." *State v. Enos*, 21 A.3d 326, 332 (R.I. 2011) (quoting *State v. Luciano*, 739 A.2d 222, 228 (R.I. 1999)). However, "with respect to questions of law and mixed questions of law and

---

[8] There was some confusion during oral argument regarding when the general instructions were given to the jury, but the record is clear that the instructions were given immediately following the prosecutor's closing argument.

fact involving constitutional issues," we employ a *de novo* review. *State v. Snell*, 892 A.2d 108, 115 (R.I. 2006).

Evidentiary rulings, on the other hand, are reviewed for abuse of discretion. *State v. Whitfield*, 93 A.3d 1011, 1016 (R.I. 2014). Moreover, we "will not disturb the trial justice's ruling unless the abuse of discretion resulted in prejudicial error." *State v. Moore*, 154 A.3d 472, 481 (R.I. 2017) (quoting *State v. Williams*, 137 A.3d 682, 686 (R.I. 2016)).

With respect to the motion for new trial, this Court "give[s] 'great weight' to a trial justice's ruling when [he or] she 'articulate[s] sufficient reasoning in support of the ruling.'" *State v. Withers*, 172 A.3d 765, 768 (R.I. 2017) (quoting *State v. Kizekai*, 19 A.3d 583, 589 (R.I. 2011)). "A party may base a motion for a new trial 'on the grounds that the weight of the evidence was not adequate to convict a defendant.'" *Moore*, 154 A.3d at 480 (quoting *State v. Lopez*, 129 A.3d 77, 83 (R.I. 2016)). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Florez*, 138 A.3d 789, 793 (R.I. 2016) (quoting *State v. Bunnell*, 47 A.3d 220, 233 (R.I. 2012)). The trial justice acts as a "'superjuror' who independently weighs the evidence and assesses the credibility of the witnesses." *State v. Breton*, 138 A.3d 800, 803 (R.I. 2016) (quoting *Battle v. State*, 125 A.3d 130, 132 (R.I. 2015)).

Discussion

**Constitutional Right to Remain Silent at Trial**

In the instant case, defendant contends that the trial justice should have granted his motion for a mistrial after the prosecutor started her closing argument with the following comment:

> "Let's clear up one thing. There's not a shred of evidence in this case, not a shred before you, to suggest that this was consensual sex. Not from [Alicia]. Certainly not from [Lauren]. And not from him."

The United States Supreme Court has held that "the Fifth Amendment * * * forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965); *see also Enos*, 21 A.3d at 332 (recognizing that the United States Supreme Court has "restricted prosecutors, judges, and witnesses from commenting on, or even mentioning, a defendant's decision to remain silent after that defendant was informed of his or her *Miranda* rights").

To determine if a comment is violative of a defendant's Fifth Amendment rights, our inquiry centers on whether "the language used in the [prosecutor's] comment was manifestly intended or was of such a character that a jury would naturally and necessarily construe it to amount to a comment on the failure of the accused to testify." *State v. Fontaine*, 113 R.I. 557, 563, 323 A.2d 571, 574 (1974). Furthermore, the "assessment of the propriety of prosecutorial argument to a jury requires review of the questioned statement in context and in light of attendant circumstances, rather than in isolation," and we engage in interpretation "of its meaning not in how we read it from the printed page, but in how a jury composed of ordinarily

intelligent lay persons would understand it as they listened to the prosecutor's closing argument." *State v. Andrews*, 120 R.I. 771, 775-76, 390 A.2d 926, 929 (1978).

In the event that such a comment violates this standard, curing the error requires that "a cautionary instruction be given immediately in order that the seed planted by the remark will not be given time to germinate." *State v. Oliveira*, 774 A.2d 893, 912 (R.I. 2001) (quoting *State v. Sherman*, 113 R.I. 77, 81-82, 317 A.2d 445, 448 (1974)). Moreover, in such an event, "[t]he cautionary instruction must be such that the jury is informed in language understandable by the ordinary, reasonable man that the defendant has a constitutional right to be free from compulsion of any kind, physical or mental, to testify in his own defense." *Id.* (quoting *Sherman*, 113 R.I. at 82, 317 A.2d at 448) (holding that the trial justice's two separate cautionary instructions that "defendants need not testify, and that no adverse inference was to be drawn from a defendant's election not to testify" were sufficient to correct any damage from the attorney's comments that no defendant had testified as to a certain issue).

In past cases, we have acknowledged our willingness to "revers[e] convictions for prejudicial misstatements by the prosecution" in certain situations. *State v. Simpson*, 606 A.2d 677, 679 (R.I. 1992). For instance, we have held that, in a trial with three defendants where one defendant elected not to testify, the trial justice's failure to instruct the jury at the close of the evidence as to the defendant's right not to testify was prejudicial error. *State v. Simpson*, 595 A.2d 803, 805-06 (R.I. 1991).

On the other hand, in *Enos*, we considered whether a defendant's Fifth Amendment rights were violated when a police officer testified that the defendant had not given the officer any information after being instructed on his *Miranda* rights, and we concluded that the trial justice was not clearly wrong in denying the motion for a mistrial. *Enos*, 21 A.3d at 332-33, 334. In

9

that case, after denying the defendant's motion for a mistrial, the trial justice instructed the jury as follows: "After Mr. Enos was administered *Miranda* rights, if you find that to be the case, you should know he had the right to remain silent if he chose to remain silent. That cannot be used against him." *Id.* at 333. We opined that, even though the comment did "implicate[] the defendant's right to remain silent," the trial justice's curative instruction to the jury sufficed to extinguish "any prejudice that may have arisen * * *." *Id.* at 334. Furthermore, we noted that the remark was not of the nature that would tend to "inflame" the jury so that the jury "could not reach an unimpassioned decision by looking solely at the evidence that was properly before them." *Id.*

In the case at bar, after the prosecutor's allegedly prejudicial comment, defense counsel objected and explained the basis for his motion for a mistrial in the absence of the jury. The prosecutor argued that she had not been alluding to defendant's right to remain silent, but rather was only commenting on defendant's statement that was in evidence—namely, that he had told Alicia she had urinated on herself. The trial justice reserved decision and brought the jury back into the courtroom. At that point, the prosecutor repeated to the jury what she had said to the trial justice—that, when confronted by Alicia, defendant told her nothing had happened and that she had urinated on herself.

When the closing arguments were complete, the trial justice delivered his general jury instructions, during which he explained that defendant enjoyed a presumption of innocence, and also possessed the right to not testify.[9] The trial justice also told the jury that what is said in

---

[9] The general instructions included the following:

> "Now, as I told you at the outset, this defendant, like every defendant in a criminal case, enjoys the presumption of innocence. Now, what that means is that this defendant, as he appears here

10

closing arguments by the attorneys is not evidence. After deliberation, the jury returned with a guilty verdict. Thereafter, the trial justice addressed and denied the motion for a mistrial.

The state argues before this Court that the prosecutor was not commenting on defendant's choice not to testify, but rather that she was responding to defendant's contention in his closing argument that the sex was consensual.[10] While defendant does not disagree that a prosecutor is permitted to rebut a consent argument, he argues that the statement—"And not from him"—crossed the line.

When considering whether the prosecutor's statements violated defendant's Fifth Amendment rights, those comments must be read in their entirety. *See State v. Boillard*, 789 A.2d 881, 885 (R.I. 2002) ("The probable effect of the prosecutorial statements on the outcome of the case must be evaluated by examining the remarks in the context in which they were made."). We also note that the trial justice is in a much better position to make factual findings and credibility determinations than we are because he "actually observed the human drama that is part and parcel of every trial and * * * had an opportunity to * * * take into account * * * [those] realities that cannot be grasped from a reading of a cold record." *State v. Gonzalez*, 986

today sitting at counsel table, is presumed to be innocent because the [s]tate, which brings the charge, must prove each and every element of that charge beyond a reasonable doubt. The defendant need not prove anything. The defendant does not have to prove his innocence. It is up to the [s]tate to prove him guilty beyond a reasonable doubt. If the defendant—and in this case the defendant chose to exercise his right not to present evidence or to testify in [*sic*] his own behalf, and you cannot draw any adverse inference or bad conclusion or hold it against him because he chose to exercise that right. And again, that presumption of innocence which he enjoys stays with him throughout the course of the trial and remains with him right into the jury room and only disappears if you decide collectively and unanimously that the [s]tate has met its burden of proof beyond a reasonable doubt as to the charge of first[-]degree sexual assault."

[10] The defendant asked for and received a consent instruction.

11

A.2d 235, 242 (R.I. 2010) (quoting *In the Matter of the Dissolution of Anderson, Zangari & Bossian*, 888 A.2d 973, 975 (R.I. 2006)).

This is not a case where the prosecutor directly commented on a defendant's failure to take the stand and testify at trial. Rather, the prosecutor stated that there was no evidence before the jury that the sex was consensual, including none from defendant. In fact, after the trial justice heard defendant's motion for a mistrial and the jury returned to the courtroom, the prosecutor continued her closing argument as follows:

> "When confronted by [Alicia] the next morning and overheard by [Lauren] the next morning, what was this defendant's response? What was the first thing he said that morning? You're bugging. Nothing happened. You pissed yourself. That was his response. Now, ask yourself, does that sound like a response of someone who woke up and had a drunken night of consensual sex? No, it's not. You know that. You know that's not what happened here. What is it? What does that sound like? It sounds like someone who took advantage of a woman that he could never get if she was awake."

As such, the prosecutor suggested that she was merely continuing to speak about the issue of consent, which indeed had been raised by defense counsel in his closing argument.

"A prosecutor is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." *State v. Cavanaugh*, 158 A.3d 268, 278 (R.I. 2017) (quoting *Boillard*, 789 A.2d at 885). Because we read that statement in context, we are satisfied that the prosecutor's comment indicates that she was referring to defendant's denial of any sexual relations with the complaining witness.

In fact, when the trial justice denied the motion for a mistrial, he found that the prosecutor's comment did not implicate Marizan's right to remain silent at all, and thus, he said that he would not have given a cautionary instruction in any event. He explained:

12

> "[I]n response to [defense counsel's argument] that [the prosecutor] got up and said, 'First let me address this issue of consent', and said, you didn't hear, and she named [Lauren] or [Alicia], saying that there had been consent, nor did you hear from your client, and at that point [defense counsel] made [his] motion, and we heard [him] at the sidebar, and [he] said that that was [an] unfair comment on [defendant's] Fifth Amendment right * * * and [the prosecutor] explained that she was talking about what he said to [Alicia], and quite frankly, when she said that, it certainly made sense to me, and I believe it was fair comment because that was the testimony in the case."

We agree with the trial justice that the prosecutor's statement, taken in context, did not violate defendant's Fifth Amendment rights.

We are further comforted by the fact that the trial justice gave the general instructions immediately after the prosecutor completed her closing argument, and we presume such instructions are followed by the jury. *See Whitfield*, 93 A.3d at 1022; *see also State v. Hunt*, 137 A.3d 689, 694 (R.I. 2016). In this case, the portion of the general instructions pertaining to defendant's right not to testify adequately expressed that he had every right to remain silent, and also admonished that such a choice could not be held against him.[11]

We caution that, in some cases, such comments by prosecutors "may approach the line of improper prosecutorial conduct." *Cavanaugh*, 158 A.3d at 279. Here, however, given the broader context of the comment, we conclude that the prosecutor's statement was not "of such a character that a jury would naturally and necessarily construe it to amount to a comment on the failure of the accused to testify." *Fontaine*, 113 R.I. at 563, 323 A.2d at 574. Thus, we hold that the trial justice did not clearly err in denying the motion for a mistrial.

---

[11] The trial justice also gave preliminary instructions at the start of the trial as to defendant's Fifth Amendment rights.

13

**B**

**Admissibility of Defendant's "Mug Shot"**

We now turn to defendant's second contention, that his "mug shot" was improperly admitted into evidence.

In accordance with the test we first outlined in *State v. Lemon*, 456 A.2d 261 (R.I. 1983), in order to introduce "mug shots" at trial, "(1) the prosecution must have a demonstrable need to introduce the photographs; (2) the photographs * * * must not imply that the defendant had a prior criminal record; and (3) the manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." *State v. Long*, 488 A.2d 427, 431 (R.I. 1985) (citing *Lemon*, 456 A.2d at 265).

In *Long*, in reviewing the first prong of the *Lemon* test, we determined that the trial justice had abused his discretion when he ruled that the state had shown a "demonstrable need" to introduce the photographs. *Long*, 488 A.2d at 432. We held that the purported reason to introduce the photographs there—a five-month delay between the crime and the first identification of the defendant—was not sufficient to satisfy the requirement. *Id.*

*Long* also identified a number of reasons why the introduction of a "mug shot" at trial may be necessary to prove the prosecution's case. *Long*, 488 A.2d at 432-33. For example, such pictures may be used to strengthen a witness's identification of a defendant in court if there is hesitation or doubt with the in-court identification. *Id.* at 432 (citing *United States v. Fosher*, 568 F.2d 207, 213 (1st Cir. 1978)). Such photographs may also be used in situations where a defendant appears physically different at trial than he did at the time of the arrest. *Id.* at 433. However, we determined that no such need was present in *Long* and, therefore, we concluded that the trial justice abused his discretion in permitting the state to introduce the pictures based on demonstrable need. *Id.*

14

With respect to the second prong of the *Lemon* test, in *State v. Dinagen*, 639 A.2d 1353 (R.I. 1994), we held that the state failed to satisfy this prong because the photographs suggested a prior criminal record. *Dinagen*, 639 A.2d at 1357. In that case, the prosecution had altered the pictures by cutting out the middle of the photograph that had contained the identification plaque held by the defendant, but left two stamps of the police department visible on the back of the photograph. *Id.*; *but see State v. Delarosa*, 59 A.3d 1185, 1189 (R.I. 2013) (deeming the *Lemon* test unnecessary where the photographs at issue, although taken while the defendant was incarcerated, contained no suggestion that he was in prison at the time).

We have previously noted "double-shot pictures, with front and profile shots alongside each other, could reasonably lead one to believe that the person in the photographs has had trouble with the police." *State v. Maxie*, 554 A.2d 1028, 1032 (R.I. 1989). As such, we have held that, at the very least, in order to properly sanitize a double-shot photograph, the prosecution should be required to separate the photographs, given this inference and the slight effort required to do so. *Id.*

In the case at bar, the photograph most certainly fails the first two prongs of the *Lemon* test. With respect to the first prong, the trial justice did not address whether the state had a need for the pictures. However, the prosecutor acknowledged that defendant's identity was not at issue at trial because Alicia "obviously" knew him, and the photograph had been used solely for the police to get an identification of defendant from Alicia. For those reasons, we find that the state failed to show a "demonstrable need" for the picture before introducing it. *See Long*, 488 A.2d at 431. At trial, the trial justice focused his analysis on the second prong, ruling that his cautionary instruction was sufficient without the need to cut the double-shot photograph in half.

Yet, because the separation of such photographs would be a simple process, we conclude that the state failed to satisfy the second prong of the *Lemon* test as well. *See Maxie*, 554 A.2d at 1032.

Nonetheless, even if the state fails to meet the *Lemon* test, we still must inquire as to whether the admission of the photographs was reversible error. *Dinagen*, 639 A.2d at 1357. In trials where the state provides "competent evidence from which the jury could convict the defendant" aside from the improperly admitted photograph, the introduction of such a picture "is not prejudicial[.]" *Id.* Moreover, "[t]he inclusion of objectionable evidence may be harmless if 'it is not reasonably possible that such evidence would influence an average jury on the ultimate issue of guilt or innocence.'" *Id.* (quoting *State v. Bowden*, 439 A.2d 263, 269 (R.I. 1982)).

In *Long*, we determined that the admission of the photograph was not reversible error because of the existence of other evidence that supported a finding that the defendant was guilty. *Long*, 488 A.2d at 433. This evidence included pretrial identifications that were witnessed by two other people and an in-court identification of the defendant. *Id.* Moreover, we acknowledged that the photographs were adequately sanitized to remove any suggestion of a criminal record and not referred to as "mug shots" at trial. *Id.*

Likewise, in *Dinagen*, we held that the admission of the defendant's picture was not prejudicial because the jury heard evidence of the defendant's prior criminal record. *Dinagen*, 639 A.2d at 1357-58. That evidence, coupled with the fact that there was "other evidence of the defendant's prior contacts with law enforcement" and also "strong evidence of the defendant's guilt," was sufficient for us to conclude that there was no reversible error. *Id.* at 1358.

Here, the trial justice gave the following cautionary instruction immediately prior to the prosecutor's publication of defendant's picture to the jury:

> "[T]he relevance of this exhibit is simply that this was the photograph shown to [Alicia] on August 21, 2012 which she

16

> identified as the defendant, Mr. Marizan, and it has no other purpose, and you cannot infer or draw any conclusion other than the fact that this—or her testimony that she's identified this. These photographs are obtained from a variety of sources. As you know on the Internet now there are many places where you can find photos of individuals; LinkedIn, Facebook, et cetera. So you can't draw any inference other than the fact that this was the photograph shown to the witness at the police station on August 21."

Furthermore, the DNA evidence at trial demonstrated the presence of defendant's seminal fluid in the vaginal swab samples taken from Alicia at the hospital, and two witnesses for the state—including Alicia—corroborated each other's testimony, all of which was buttressed by the video that showed Alicia seemingly unconscious. *See Long*, 488 A.2d at 433 (relying on "strong evidence" of the defendants' guilt with respect to the pretrial identification of the defendants as sufficient to overcome improper introduction of the photographs). We are satisfied that, because of this other evidence of guilt and the trial justice's timely and thorough cautionary instruction with respect to defendant's photograph, the admission was not reversible error. *See Dinagen*, 639 A.2d at 1358.

## C

### Motion for New Trial

Finally, defendant appeals the denial of his motion for new trial. The defendant contends that the trial justice erred in making the two following findings in denying the motion for new trial: (1) finding Alicia and Lauren credible as witnesses regarding nonconsensual sexual intercourse; and (2) interpreting Lupino's testimony regarding the Y-STR DNA results of Alicia's sexual-assault examination as equal to standard DNA results.

In ruling on a motion for new trial, we emphasize that a trial justice should deny such a motion if he or she "concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did * * *." *Kizekai*, 19 A.3d at 590 (quoting *State*

17

*v. Pineda*, 13 A.3d 623, 641 (R.I. 2011)). The defendant challenged the trial justice's acceptance of Alicia's testimony because of her purported motive to lie. At trial, Alicia testified that she had broken up with her boyfriend before the night in question. Based on that testimony, defendant contended that Alicia may have fabricated her testimony to appease her boyfriend.

The trial justice, in finding Alicia credible, adequately acknowledged the entirety of her statements, including her purported motive to lie. He also made note of her extensive alcohol and drug use that evening. *See State v. Lopez*, 149 A.3d 459, 465 (R.I. 2016) (declining to entertain the defendant's argument that the trial justice should not have believed the state's witnesses because they had motives to fabricate their testimony). Still, in finding Alicia to be a credible witness, the trial justice relied on the fact that her testimony was corroborated by Lauren's statements, the video of the prank that showed Alicia to be unconscious, and the DNA evidence. *See State v. Ferreira*, 21 A.3d 355, 367 (R.I. 2011) (upholding a denial of a motion for new trial where the trial justice "appropriately reviewed 'the entire record' and sufficiently outlined her reasons for denying" the motion). Consequently, we are satisfied that the trial justice did not err when he found Alicia credible.

In ruling on the motion for new trial, the trial justice also found Lauren's testimony credible, noting that her testimony was corroborated by both Alicia's testimony and by the DNA evidence. The trial justice also pointed out that Lauren's testimony regarding the baking soda prank and the timeline of finding the door locked while her sister and defendant were in the room was echoed by the video of the prank that evidenced Alicia's apparent unconsciousness while still fully clothed. The trial justice found "the most damaging" evidence to be Lauren's testimony that she later found her sister unconscious without pants or underwear and the defendant wearing only boxer shorts.

The defendant appears to quarrel most with Lauren's testimony that she found her sister partially dressed in the bedroom shortly after the baking soda prank, but did nothing about it until nearly three hours later, after she came back from breakfast. While defendant's view of Lauren's testimony may have merit, his disagreement with the trial justice's "credibility determinations is not a sufficient basis to warrant the granting of a motion for a new trial." *State v. Cipriano*, 21 A.3d 408, 430 (R.I. 2011). The trial justice took note of the fact that Lauren was candid about her alcohol use that night, which was brought out on cross-examination. Moreover, he acknowledged that the police investigation "was less than desirable or less than comprehensive" with respect to the witnesses who were interviewed. Nevertheless, we are satisfied that the trial justice's finding that Lauren's testimony was credible was not a clear error.

Finally, the defendant maintains that the trial justice misconstrued the DNA evidence—which was the only evidence of sexual penetration[12]—as a "match" to defendant, while defendant contends that the DNA testing that was conducted indicated that the DNA could have belonged to other individuals in defendant's paternal line. This, defendant argues, means that the trial justice overlooked the fact that the seminal fluid could have been from another sexual partner of Alicia.

While we admire the zealous advocacy efforts demonstrated in defendant's brief regarding the issue, we find no need to delve into the specifics of the science behind the DNA testing conducted in the present case. The defendant refers us to a number of out-of-state jurisdictions to demonstrate the inconclusiveness of the Y-STR testing, but this appeal is from a denial of a motion for new trial, not a motion to admit evidence at trial, *see United States v. Kootswatewa*, 99 Fed. R. Evid. Serv. 1095, 1095-96, 2016 WL 808663, at *1 (D. Ariz. 2016);

---

[12] In accordance with § 11-37-2(1), a finding of guilt for the crime of first-degree sexual assault requires sexual penetration with another person.

nor is it a direct challenge to the trial justice's evidentiary ruling on the admissibility of the evidence. *See People v. Stevey*, 148 Cal. Rptr. 3d 1, 11 (Cal. Ct. App. 2012).

Instead, we are concerned only with whether the trial justice, after assessing the witnesses' credibility and the weight of the evidence, either agrees with the verdict or finds that "the evidence and the reasonable inferences drawn therefrom are so nearly balanced that reasonable individuals could differ." *Withers*, 172 A.3d at 769 (quoting *Moore*, 154 A.3d at 481). In his bench decision on the motion for new trial, the trial justice discussed Lupino's testimony regarding the Y-STR DNA testing, commenting that "[o]ne might say the most damning evidence of all" was her testimony that defendant's DNA sample matched the swab taken from Alicia at the hospital. The trial justice did not clearly err in accepting the expert testimony that the DNA obtained from the sexual-assault examination belonged to defendant. The fact that he referred to the DNA evidence as a "match" rather than "consistent" with Marizan's DNA might be imprecise, but such a paraphrasing of witness testimony does not rise to the level of "overlooking or misconceiving evidence." *State v. Watkins*, 92 A.3d 172, 192 (R.I. 2014).

After a review of the record and the trial justice's articulated reasoning in denying the motion for new trial, we are satisfied that the trial justice did not "overlook[] or misconceive[] relevant and material evidence" and that he sufficiently evaluated the credibility of the witnesses at trial. *State v. Paola*, 59 A.3d 99, 104 (R.I. 2013) (quoting *State v. Banach*, 648 A.2d 1363, 1368 (R.I. 1994)). Therefore, we will not disturb the trial justice's denial of the motion for new trial on appeal.

# IV

## Conclusion

For the foregoing reasons, the defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed. The papers in the case are remanded to the Superior Court.

**Justice Robinson, dissenting.** Although I acknowledge that this is a reasonably close case, I nevertheless feel obliged to respectfully dissent.

First, I disagree with the majority's conclusion that "the prosecutor's statement, taken in context, did not violate defendant's Fifth Amendment rights." In my view, the prosecutor's "[a]nd not from him" comment during her closing argument certainly could have been construed by one or more jurors as a comment on the defendant's Fifth Amendment right not to testify because that comment was of such a character that it could "clearly call[] to the jury's mind the fact that [defendant] failed to testify." *State v. Andrews*, 120 R.I. 771, 775, 390 A.2d 926, 929 (1978) (quoting *United States v. Flannery*, 451 F.2d 880, 881-82 (1st Cir. 1971)).

The very first words of the prosecutor's closing argument were as follows:

> "Let's clear up one thing. There's not a shred of evidence in this case, not a shred before you, to suggest that this was consensual sex. Not from [Alicia]. Certainly not from [Lauren]. *And not from him*." (Emphasis added.)

It is my considered opinion that this comment about the state of the evidence could have prompted one or more jurors reasonably to conclude that defendant's decision not to testify should be held against him. It should be recalled that both Alicia and Lauren had testified at length during the trial, whereas defendant did not testify at all. Given this context, the inference that a reasonable juror could draw from the prosecutor's comment ("[a]nd not from him") was that defendant had defaulted on some duty to prove his innocence by testifying. Such an

21

inference (which, I repeat, would have been a reasonable one) would have clashed with defendant's constitutionally guaranteed right not to testify. Viewed in this perspective, a jury composed of ordinarily intelligent lay persons could reasonably understand the prosecutor's comment to be "a comment on the failure of the accused to testify." *State v. Fontaine*, 113 R.I. 557, 563, 323 A.2d 571, 574 (1974).

It is further unsettling to me that only the trial justice, and not the jury, ever heard the prosecutor's explanation for the above-quoted comment about the evidence. After defense counsel objected to the prosecutor's comment and the jury exited the courtroom, the prosecutor explained to the trial justice that her remark had not been meant to allude to the fact of defendant's having chosen not to testify, but rather was just a comment on the shifting nature of the defense's theory of the case—*viz.*, the evolution from a denial that defendant and Alicia had had any sexual encounter to a later acknowledgment that there had been an encounter but an assertion that it was consensual. The prosecutor further explained to the trial justice that the comment at issue was intended by her to be a reference to what (according to Alicia) defendant had said to Alicia *on the morning of August 18, 2012*, when she accused him of having sexually assaulted her. In his response to that accusation, defendant (again according to Alicia) never said that there had been consensual sex between them, but rather he simply told Alicia that she was "bugging" and that "[n]othing happened." The prosecutor represented that her comment was not directed at defendant's choice not to testify. Notably, however, the jury never heard the explanation of the prosecutor concerning her ambiguous[1] but potentially constitutionally improper comment. Rather, after the trial justice heard counsel's explanation and reserved his

---

[1]    It should go without saying that the fact that the prosecutor had to rebut one reading of her comment and represent that a different meaning was intended indicates that the comment was ambiguous and necessitated, at the very least, an immediate curative instruction.

decision on defendant's motion for a mistrial, the jurors re-entered the courtroom, and the prosecutor simply continued her closing argument. No curative instruction was given by the trial justice before that argument resumed.

Accordingly, because I believe that the quoted phrases from the prosecutor's closing argument could rationally be understood by a jury to constitute an impermissible comment on defendant's decision not to testify, it is my opinion that it was incumbent upon the trial justice to provide an *immediate* and adequate curative instruction. *See State v. Sherman*, 113 R.I. 77, 81-82, 317 A.2d 445, 448 (1974).

While I acknowledge that the trial justice made a laudable effort to mitigate the potential prejudice inherent in the prosecutor's comment when he gave his general instructions, it is my view that, because no curative instruction *immediately* followed the prosecutor's comment, the trial justice's later instruction as to defendant's right not to testify was insufficient to cure that potential prejudice. It is my understanding that our case law requires that the problematic nature of such comment can be cured only by the issuance of an *immediate* curative instruction. *See id.* ("If such error is to be cured, it is essential that a cautionary instruction be given immediately in order that the seed planted by the remark will not be given time to germinate.").[2]

---

[2]    I consider the following lapidary sentences from Chief Judge Aldrich's opinion in the case of *Desmond v. United States*, 345 F.2d 225 (1st Cir. 1965), to be very pertinent to the issue presented by this case:

> "If it be assumed that the government's argument constituted comment upon appellant's failure to testify, was it cured by the charge? We think not. Correction of error should be as prompt and timely as possible—particularly where the error involves the infringement of a constitutional right, as this did. *Griffin v. State of California*, [380 U.S. 609 (1965)].   The appellant promptly objected.   The remedy, to be fully effective, should have been administered equally promptly." *Desmond*, 345 F.2d at 226-27.

23

Here, the record reveals that *thirty-two transcript pages* separate the prosecutor's improper comment from the portion of the trial justice's general jury instructions which addressed the presumption of innocence and defendant's constitutionally guaranteed right not to testify. Thus, while it is difficult to determine from the record precisely how much time elapsed between the making of the comment at issue and the trial justice's instruction about defendant's right not to testify, it is clear that a substantial amount of time did elapse for there to be thirty-two transcript pages between the prosecutor's comment and the relevant jury instruction. This significant time gap leads me to conclude that the relevant portion of the general jury instructions was not sufficiently "immediate" to cure the constitutional violation in this case. *See Sherman*, 113 R.I. at 81-82, 317 A.2d at 448. The prosecutor's comment could very well have been understood by the jurors as a reference to defendant's decision not to testify, and I believe that the trial justice, by waiting until after the prosecutor finished her closing argument to give an instruction, may very well have allowed a constitutionally erroneous seed about defendant's decision not to testify to germinate in the minds of one or more jurors. The admonitory language in *Sherman* bears repeating: "If such error is to be cured, it is *essential* that a cautionary instruction be given *immediately* in order that the seed planted by the remark will not be given time to germinate." *Sherman*, 113 R.I. at 81-82, 317 A.2d at 448 (emphasis added).

I do not question the good faith of the prosecutor, and her explanation as to what she intended when making the comment at issue is certainly plausible. However, I am nonetheless of the opinion that the jury might reasonably have understood the prosecutor's comment to be a comment on the defendant's constitutionally guaranteed right not to testify; and I am of the further opinion that the trial justice's general jury instructions were insufficient to cure that constitutional violation because they were not given immediately after the comment was made.

24

As such, I believe that the judgment of the Superior Court should be vacated and the case remanded for a new trial.

Accordingly, I respectfully but unblinkingly dissent from the majority's opinion.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Andre Marizan. |
| **Case Number** | No. 2015-322-C.A. (P1/14-403A) |
| **Date Opinion Filed** | June 12, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Stephen P. Nugent |
| **Attorney(s) on Appeal** | For State: <br><br> Aaron L. Weisman <br> Department of Attorney General <br> For Defendant: <br><br> Angela M. Yingling <br> Office of the Public Defender |